UNITED STATES of America, Appellee,

v.

Calixto AGAPITO, Martha Calderon and Horacio Rueda, Appellants.

Nos. 413, 414 and 484, Dockets 79–1257, 79–1265 and 79–1377.

United States Court of Appeals, Second Circuit.

Argued Nov. 26, 1979.

Decided March 12, 1980.

Ronald D. Degen, New York City (Barry I. Slotnick and Lawrence M. Hermann, New York City; Melvin Ravech, Raymond Sussman, and Ravech & Aronson, Boston, Mass., on the brief), for appellants Agapito and Calderon.

Charles Sutton, New York City, for appellant Rueda.

Jeffrey E. Livingston, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., and Gregory L. Diskant, Asst. U. S. Atty., New York City, on the brief), for appellee.

Before TIMBERS, VAN GRAAFEI-LAND and NEWMAN, Circuit Judges.

TIMBERS, Circuit Judge:

After an eleven day jury trial in the Southern District of New York, Irving Ben Cooper, District Judge, appellants Calixto Agapito, Martha Calderon and Horacio Rueda were convicted of conspiring to possess and distribute cocaine, in violation of 21 U.S.C. § 846 (1976) (Count One), and possessing with intent to distribute approxi-

mately one kilogram of cocaine, in violation of 21 U.S.C. § 841 (1976) (Count Four). Rueda also was convicted of possessing with intent to distribute approximately six kilograms of cocaine, in violation of 21 U.S.C. § 841 (1976) (Count Two), and carrying a firearm during the commission of a federal felony, in violation of 18 U.S.C. § 924(c)(2) (1976) (Count Three).[1]

We find that the chief questions on appeal relate to the seizure of certain evidence allegedly in violation of the Fourth Amendment. Specifically, appellants raise the following questions:

(1) Whether federal agents in a hotel room adjoining the hotel room of Agapito and Calderon violated the Fourth Amendment when the agents pressed their ears against a door connecting the two rooms in an attempt to overhear appellants' conversations.

(2) Whether the arrests of appellants were based on probable cause.

(3) Whether the agents' warrantless entry into the hotel room of Agapito and Calderon after their arrests, although illegal, compels reversal of their convictions.

We hold that the agents' eavesdropping did not violate the Fourth Amendment and that appellants' arrests were based on probable cause. Although we conclude that the agents' entry into the hotel room was improper, for the reasons stated below we nevertheless affirm the convictions of all appellants on all counts.

**I.**

On the afternoon of February 21, 1979 an informant called Special Agent Victor Aponte of the Drug Enforcement Administration (DEA) with information regarding narcotics activity at the Sheraton Center Hotel in Manhattan. The informant told Aponte that he had received the information from a close friend referred to as "Mr. X".[2] The informant was considered reliable. Previous information from him had led to at least two search warrants and several arrests and convictions. In addition, information provided by Mr. X to the informant had proven reliable in the past. It had resulted in the issuance of a search warrant, arrests and the seizure of narcotics.

The information provided by Mr. X, as relayed by the informant to Aponte, was that a male and a Cuban female from Miami named Martha had been in Room 1701 of the Sheraton Center for several days and that they had approximately four kilograms of cocaine that they wished to sell before the weekend. Mr. X had seen and sampled the cocaine. According to Mr. X, other individuals had sampled the cocaine and were planning to purchase it.

Agents Richard Bell and Jaime Forteza were assigned to the case and arrived at the Sheraton Center at approximately 6:00 p.m. that evening. They confirmed with hotel security personnel that a Martha Calderon, with a Miami address, was staying in Room

---

1. Following the return of the jury's verdicts finding all appellants guilty on all counts as charged, the district court sentenced appellants as follows:

Agapito . . . . . . Concurrent five year terms of imprisonment on Counts One and Four, to be followed by concurrent three year special parole terms on each count.

Calderon . . . . . One year term of imprisonment on Count One, with credit for time served; five year term of imprisonment on Count Four, execution suspended and appellant ordered to serve five year term of probation; three year special parole terms on Counts One and Four, to

commence on expiration of confinement.

Rueda . . . . . . . Concurrent seven year terms of imprisonment on Counts One, Two and Four, to be followed by concurrent ten year special parole terms on each count; three year term of imprisonment on Count Three, to be served consecutively to sentences on Counts One, Two and Four.

2. The government asked that the identity of "Mr. X" not be disclosed. It submitted a supporting affidavit setting forth his identity but requesting that the affidavit be sealed in order to protect the source.

1701. The hotel records disclosed that she had paid in cash on a daily basis the double room rate of $76 per day, as well as room service and telephone calls.

The agents obtained permission to use Room 1702, which adjoins Room 1701, for surveillance. The door to Room 1701 was open when the agents walked by. They observed Calderon and Agapito inside. Once inside Room 1702 the agents could hear sounds and parts of conversation coming from Room 1701. The two rooms had a common wall with a connecting door. There was a crack between the door and the door frame. By pressing their ears to the crack, the agents could hear additional noises and conversations. Forteza, who had grown up in Cuba, recognized that Calderon spoke with a Cuban accent.

The next day, February 22, Forteza heard the dialing of the phone in Room 1701. He then heard Agapito say to Calderon, "He's bringing it over now." At approximately 2:00 p. m. that afternoon an agent who had taken up an observation post in Room 1708 observed Horacio Rueda enter Room 1701. Rueda was carrying an attache case and a shoulder bag. He was accompanied by a small boy.

While Rueda was in Room 1701 the agents heard the sounds of tape being torn and paper being shuffled and counted. Aponte, who by this time had joined his colleagues in Room 1702, heard a male voice in Room 1701 say the figures "one-five-zero-zero-zero" during the shuffling sounds.

After fifteen minutes Rueda and the boy left the room but without the attache case and the shoulder bag. Rueda was arrested by DEA agents in the hotel lobby. A search revealed that he was carrying a loaded .22 caliber derringer. He was taken to DEA headquarters. After being advised of his rights he admitted that the attache case he delivered to Room 1701 had contained cocaine. There was conflicting testimony as to whether Rueda subsequently retracted that statement. In any event the statement was conveyed by telephone to the agents in Room 1702.

Around 4:00 p. m. that afternoon Agapito and Calderon left Room 1701. Agapito was carrying the attache case delivered by Rueda. DEA agents arrested the two in the hotel lobby, opened the attache case and found $29,000 inside.

After the arrests the agents went upstairs to Room 1701. They were admitted to the room by hotel security personnel. Once inside the agents seized, but did not open, a blue suitcase. They did not otherwise search the room.

At 6:15 p. m. that evening the telephone in Room 1701 rang. Posing as an associate of Agapito and Calderon, Forteza answered the phone. A female, later identified as Ligia Atehortua, inquired as to the whereabouts of Rueda and the boy who was her son. She called back twice and spoke each time to Forteza who was still posing as an associate of Agapito and Calderon. Eventually she gave Forteza permission to come to her apartment at 328 East 25th Street.

Together with three other agents, Forteza went to Atehortua's apartment. He identified himself as a DEA agent and obtained the verbal and written consent of Atehortua to search her apartment. The search resulted in the seizure of six kilograms of cocaine, $2,810 in cash, various items of narcotics paraphernalia and several pictures of Rueda. The agents and Atehortua then returned to Room 1701 where she spent the night.[3]

At 4:00 p. m. the following day, February 23, after the agents had been in possession of Room 1701 for almost twenty-four hours, a search warrant was obtained to search the room. The agents opened the blue suitcase which had been seized upon the agents' original entry into the room the day before. They found approximately one kilogram of cocaine in the suitcase.

An indictment was returned in the Southern District of New York on March 1, 1979 charging appellants with the offenses stat-

---

**3.** Atehortua was never arrested. She returned to her apartment the next day and subsequent-

ly disappeared. She did not testify at the suppression hearing or at the trial.

ed above. Before trial, appellants moved to suppress all post-arrest statements and all evidence seized from them, from Room 1701 and from Atehortua's apartment. Following a four day evidentiary hearing, the district court denied the suppression motions. The trial began May 9, 1979 and concluded May 23 when the jury returned verdicts finding all appellants guilty on all counts as charged. On June 27, 1979 sentences were imposed as stated above. From the judgments of conviction entered on June 27, these appeals have been taken.

## II.

In the light of these facts and prior proceedings, we turn first to the question whether the DEA agents violated the Fourth Amendment when they eavesdropped on appellants' conversations by pressing their ears to the door connecting Rooms 1701 and 1702.[4] We hold that they did not.

The starting point for our analysis is *Katz v. United States*, 389 U.S. 347 (1967). There government agents eavesdropped on conversations in a telephone booth by means of an electronic listening device attached to the top of the booth. Holding that "the Fourth Amendment protects people, not places", *id.* at 351, the Court discarded the trespass analysis applied in prior cases to determine whether a Fourth Amendment search and seizure occurred. *Id.* at 351–53. The Court concluded that, despite the absence of a physical intrusion into the telephone booth, the agents' actions "violated the privacy upon which [the defendant] *justifiably relied* while using the telephone booth and thus constituted a 'search and seizure' within the meaning of the Fourth Amendment." *Id.* at 353 (emphasis added).

■ As stated more explicitly in Justice Harlan's oft-cited concurring opinion, the Court established a two-part test for determining whether a Fourth Amendment search and seizure occurred: "first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as '*reasonable.*'" *Id.* at 361 (Harlan, J., concurring) (emphasis added).

Subsequent cases have illustrated the two-part *Katz* test. In *United States v. White*, 401 U.S. 745 (1971), for example, the Court upheld the use of the defendant's statements that federal agents had overheard by means of a transmitter worn by an informant during meetings with the defendant.[5] Undoubtedly the defendant in *White* expected that his conversations with the informant would be private. This expectation was held not to be protected, however, because he took the risk that a person "to whom he voluntarily confides" would reveal his secrets to the police. *Id.* at 749 (quoting *Hoffa v. United States*, 385 U.S. 293, 302 (1966)). Thus, the defendant's expectation of privacy was not reasonable.

■ We have applied the reasonable expectation of privacy principles of *Katz* to non-electronic eavesdropping on several occasions. In *United States v. Llanes*, 398 F.2d 880 (2 Cir. 1968), *cert. denied*, 393 U.S. 1032 (1969), we upheld the eavesdropping by an agent who was positioned outside the defendant's apartment door. *Accord, United States v. Wilkes*, 451 F.2d 938, 941 n. 6 (2 Cir. 1971). In *Llanes* we reasoned that an individual who speaks in a tone audible to a person outside his door does not have a reasonable expectation of privacy. 398 F.2d at 883–84. Although the defendant expected that conversations spoken in his

---

**4.** Although the three appellants asserted this claim in the district court, only Rueda presses it on appeal. We conclude that Rueda, though only a casual visitor to the hotel room of Agapito and Calderon, is entitled to challenge the eavesdropping under the automatic standing rule because, in addition to the conspiracy charge, he was charged with possession of the cocaine found in Room 1701. Section IV(A) of

this opinion, *infra; United States v. Penco*, 612 F.2d 19, 22–24 (2 Cir. 1979).

**5.** The plurality opinion in *White* is authoritative on this point. *United States v. Horton*, 601 F.2d 319, 320–21 & n.1 (7 Cir. 1979); *United States v. Bonanno*, 487 F.2d 654, 657 n. 1 (2 Cir. 1973); *cf. United States v. Miller*, 425 U.S. 435, 443 (1976).

apartment would be private, his expectation of privacy was not reasonable. He took the risk that the conversations would be overheard by others. We did not consider it onerous to hold the defendant to such a risk, observing that "[t]he risk of being overheard by an eavesdropper . . . is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak." *Id.* at 884 (quoting *Hoffa v. United States*, 385 U.S. 293, 303 (1966)).[6]

*Llanes*, however, did not involve an agent pressing his ear to a door. In *United States v. Ortega*, 471 F.2d 1350 (2 Cir. 1972), *cert. denied*, 411 U.S. 948 (1973), we applied the rationale of *Llanes* to such a case by way of dictum. The defendants in *Ortega* raised the possibility that federal agents had overheard their conversations through an adjoining wall. We found nothing illegal in that conduct. We said "[w]hat can be heard by the naked ear is not protected by the Fourth Amendment." *Id.* at 1361. We emphasized again that an individual in modern society assumes the risk of having his conversations overheard by another. *Id.*

In the instant case appellants invite us to limit the dictum in *Ortega* by holding that law enforcement officers never may place their ears against doors in order to eavesdrop on conversations. In essence, the argument is that eavesdropping is permissible only when the speaker takes the risk of speaking loudly but not when the speaker uses normal tones audible only to an ear pressed to the door. Granted, the argument has a surface appeal; one who speaks in a normal tone may have a more reasonable expectation of privacy than one who speaks loudly. On the facts of this case, however, we find the argument to be un-

persuasive. We hold that the expectation of privacy asserted by appellants here is not reasonable. In so holding, we rely upon three critical factors.

First, appellants' conversations were heard by the *naked human ear*. Regardless of whether the tones may be described as loud or normal, the fact remains that appellants were talking *loud enough* to be heard by others in an adjoining room. The agents were unaided by any artificial, mechanical or electronic device.[7]

Second, the agents had a legal right to be in the adjoining room. We decline to restrict their movements in their own room in order to prevent the overhearing of conversations in an adjoining room. It strikes us as impractical to permit an agent in an adjoining room to listen while standing immediately next to a wall or connecting door without touching it but to prohibit him from listening by moving his ear several inches and pressing it against the wall or connecting door. The Ninth and Fifth Circuits, in rejecting claims identical to that asserted here, likewise have found it unwise to sanction the type of hair-splitting distinctions urged upon us in the instant case. As the Ninth Circuit has put it:

"Appellants would have us divide the listening room into privileged or burdened areas, and the conversations into degrees of audibility to, we presume, the normal ear[:] thus a remark heard on the bed arguably admissible, but not those heard at the door, a loud remark admissible, arguably one uttered in 'normal' tones, but definitely not one whispered. We find no precedent for a categorization involving such hair-splitting distinctions and we are not disposed to create one."

---

6. The *Hoffa* Court, in turn, was quoting Justice Brennan in *Lopez v. United States*, 373 U.S. 427, 465 (1963) (dissenting opinion).

7. The absence of electronic eavesdropping of course is significant. As Justice Brennan has pointed out:

"[T]here is a qualitative difference between electronic surveillance . . . and conventional police strategems such as eavesdropping . . . . The latter [does] not so seriously intrude upon the right of privacy

. . . . [Eavesdropping] is the kind of risk we necessarily assume whenever we speak. But as soon as electronic surveillance comes into play, the risk changes crucially. There is no security from that kind of eavesdropping, no way of mitigating the risk, and so not even a residuum of true privacy." *Lopez v. United States, supra*, 373 U.S. at 465–66 (dissenting opinion), *quoted in United States v. Llanes, supra*, 398 F.2d at 864.

*United States v. Fisch*, 474 F.2d 1071, 1077 (9 Cir.) (per curiam), *cert. denied*, 412 U.S. 921 (1973), *quoted in United States v. Jackson*, 588 F.2d 1046, 1054 (5 Cir. 1978), *cert. denied*, 442 U.S. 931 (1979).

We emphasize that the agents had a legal right to be where they were. The door to which their ears were pressed was a shared door. It connected Rooms 1701 and 1702. The agents' ears were pressed against the agents' side of the shared door. What can be heard by the naked ear, when the ear is where it has a right to be, is not protected by the Fourth Amendment.

This is not to suggest of course that the absence of a trespass is a controlling factor in determining the applicability of the Fourth Amendment. *Katz* clearly outlaws that analysis. We adhere to the reasonable expectation of privacy principles of *Katz*. Our holding is predicated on the assumption that "the location of the government surveillant vis-a-vis the individual surveilled is . . . a factor to be considered in assessing the justifiability of the individual's privacy expectations." *United States v. Jackson, supra*, 588 F.2d at 1054; *accord, United States v. Fisch, supra*, 474 F.2d at 1078; *see Rakas v. Illinois*, 439 U.S. 128, 144 n. 12 (1978) ("[T]he Court has not altogether abandoned use of property concepts in determining the presence or absence of the privacy interests protected by [the Fourth] Amendment.") In view of the absence of electronic eavesdropping here, we believe that our approach is consistent with *Katz*.

Third, appellants were in a hotel room. True, the occupants of a hotel room are entitled to the protection of the Fourth Amendment. *E. g., Hoffa v. United States*, 385 U.S. 293, 301 (1966). But the reasonable privacy expectations in a hotel room differ from those in a residence. The reasonableness of an individual's privacy expectations appropriately may be considered in the context of a "place". *United States v. Jackson, supra*, 588 F.2d at 1052 ("[W]hat

is reasonable in one setting may be unreasonable in another . . . .") As Justice Harlan pointed out in his concurring opinion in *Katz*, while the Fourth Amendment protects people, not places, "[t]he question . . . is what protection it affords those people. Generally, as here, the answer to that question requires reference to a 'place.'" 389 U.S. at 361.

The Fifth Circuit has pointed out some of the differences between the privacy of a motel or hotel room and a residence in the context of Fourth Amendment rights: [8]

"[D]espite the fact that an individual's Fourth Amendment rights do not evaporate when he rents a motel room, the extent of the privacy he is entitled to reasonably expect may very well diminish. For although a motel room shares many of the attributes of privacy of a home, it also possesses many features which distinguish it from a private residence: 'A private home is quite different from a place of business or a motel cabin. A home owner or tenant has the exclusive enjoyment of his home, his garage, his barn or other buildings, and also the area under his home. But a transient occupant of a motel must share corridors, sidewalks, yards, and trees with the other occupants. Granted that a tenant has standing to protect the room he occupies, there is nevertheless an element of public or shared property in motel surroundings that is entirely lacking in the enjoyment of one's home.' *Marullo v. United States*, 328 F.2d 361, 363 (5 Cir. 1964)." *United States v. Jackson, supra*, 588 F.2d at 1052.

In view of the transient nature of hotel guests, moreover, one cannot be sure who his neighbors are in a hotel room. A person in a residence generally knows who his neighbors are. A person in a hotel room therefore takes a greater risk than one in a residence that, instead of neighbors, an adjoining room may contain strangers or, as in this case, even persons with interests adverse to his own.[9]

**8.** While *Jackson* dealt only with motel rooms, it is equally applicable to hotel rooms.

**9.** An apartment of course has features common to both a private home and a hotel room. This case does not involve an apartment—only a hotel.

In view of the "open, public, and shared atmosphere", together with the "nearness" and transience of one's neighbors in a hotel room, *United States v. Jackson, supra*, 588 F.2d at 1052, we believe that an occupant of a hotel room with connecting doors cannot reasonably assume that his conversations— even those spoken in a normal tone—never will be overheard by others in an adjoining room. Sound travels. Often it will travel to an adjoining room. And when the adjoining room has a connecting door, as in this case, sound may well be expected to travel from one adjoining room to another.

It may not have been gentlemanly of the agents to press their ears against the door in order to overhear conversations. But the same can be said of many other constitutionally permissible investigatory techniques. *Id.* at 1053; *United States v. Fisch, supra*, 474 F.2d at 1077. We are concerned here with the "competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 14 (1948). The specific question before us is whether the agents violated the Fourth Amendment. We hold that they did not.

### III.

We turn next to appellants' contentions that their arrests were illegal for lack of probable cause. The applicable standard is well settled, namely, that "probable cause to arrest exists when an officer has knowledge of facts and circumstances 'sufficient to warrant a prudent man in believing' that an offense is being or has been committed." *United States v. Rueda*, 549 F.2d 865, 870 (2 Cir. 1977) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). Applying that standard to the facts of this case, we hold that there was probable cause for appellants' arrests.

### A.

With respect to the arrest of Rueda, the agents acted upon information received from their reliable informant and his reliable source. This was corroborated by the agents' own observations. Although the informant's tip did not refer to Rueda, his conduct provided an ample basis from which the agents reasonably could have concluded that he was connected with the narcotics trafficking disclosed by the tip.

The informant's tip clearly disclosed criminal activity in Room 1701. Mr. X, the informant's source, had stated that Agapito and Calderon were selling cocaine in the room. Mr. X had seen and sampled the cocaine. And according to Mr. X, other persons had sampled the cocaine and were planning to purchase it.

Applying the standards set forth in *Aguilar v. Texas*, 378 U.S. 108 (1964), and *Spinelli v. United States*, 393 U.S. 410 (1969), we hold that this information provided a reliable basis for action by the agents. As stated above, both the informant and Mr. X had given reliable information relating to narcotics transactions in the past. Moreover, the nature of Mr. X's information indicated that it was based upon firsthand observation. Arresting officers may act upon information provided by an eyewitness to a crime without a showing of reliability of the witness or his information. *United States v. Rollins*, 522 F.2d 160, 164 (2 Cir. 1975), *cert. denied*, 424 U.S. 918 (1976).

Furthermore, the agents confirmed significant portions of the information provided by Mr. X. They learned that Room 1701 was occupied by a male and a Cuban female named Martha, as Mr. X had stated. The agents also overheard conversations indicating that goods were for sale in the room. The corroboration of these otherwise innocent facts justified the agents' reliance on Mr. X's information. *E. g., United States v. Dien*, 609 F.2d 1038, 1043 (2 Cir. 1979), *modified on rehearing*, 615 F.2d 10 (2 Cir. 1980).

By the time Rueda arrived on the scene, therefore, the agents knew, based upon Mr. X's information and their own observations, that Agapito and Calderon were dealing in cocaine and that they were expecting visitors to purchase the cocaine. In view of these facts, Rueda's actions strongly indicated that he was connected with narcotics

trafficking. He and the small boy who accompanied him were the only visitors to the room during the two days it was under surveillance. When Rueda was in the room, the agents heard sounds suggesting the counting of large sums of money—facts indicative of narcotics trafficking. *United States v. Tramunti*, 513 F.2d 1087, 1105 (2 Cir.), *cert. denied*, 423 U.S. 832 (1975). Finally, Rueda obviously had made a delivery to the room. He entered the room with an attache case and shoulder bag. He left with neither.

Accordingly, we hold that, since the agents had "knowledge of facts and circumstances 'sufficient to warrant a prudent man in believing'" that Rueda was a participant in a narcotics conspiracy, *United States v. Rueda, supra*, 549 F.2d at 870, there was probable cause for his arrest.[10]

### B.

■ With respect to the arrests of Agapito and Calderon as they left Room 1701 with the attache case, it follows a fortiori from what we have said regarding the arrest of Rueda that there was probable cause for the arrests of Agapito and Calderon.

As stated above, Rueda was not mentioned in the informant's tip; the agents had to infer his criminal role from his actions and the other activity in Room 1701. As for Agapito and Calderon, on the other hand, the agents had direct, corroborated information that they, as the occupants of Room 1701, were dealing in cocaine.

Moreover, Rueda's confession that he had delivered cocaine to the room established probable cause for the arrests of Agapito and Calderon. Appellants attack the government's reliance on Rueda's confession to establish probable cause for the arrests of Agapito and Calderon on the ground that Rueda later recanted. While there is some question whether Rueda in fact did recant, that is irrelevant to our present inquiry. For even if Rueda did

recant, the agents were entitled to believe his confession and not his recantation. A statement against penal interest, especially one that is consistent with all other known information, is more reliable than a statement which seeks to exculpate a person charged with crime.

We hold that there was probable cause for the arrests of Agapito and Calderon.

### IV.

This brings us to appellants' claim that the agents' warrantless entry into Room 1701 following the arrests of Agapito and Calderon was illegal. We hold that the entry was illegal but that such illegal entry, under the circumstances of this case, does not require reversal of appellants' convictions.

### A.

At the outset we must consider the Supreme Court's decision in *Rakas v. Illinois*, 439 U.S. 128 (1978). Prior to *Rakas*, the analysis of a Fourth Amendment claim involved two questions. The first was whether the defendant had standing to challenge the search or seizure. *Alderman v. United States*, 394 U.S. 165 (1969.) If that question was answered in the affirmative, the second question involved the merits of the defendant's claim.

In *Rakas*, however, the Court dispensed with the initial question of standing as a "theoretically separate" concept and treated it as subsumed within substantive Fourth Amendment doctrine. 439 U.S. at 138–40.

■ While the Court in *Rakas* may have dispensed with the rubric of standing, subsequent decisions have indicated that Fourth Amendment analysis continues to involve the same two questions. *E. g.*, *United States v. Frezzo Brothers, Inc.*, 602 F.2d 1123, 1130 n. 11 (3 Cir. 1979); *United States v. Salvucci*, 599 F.2d 1094, 1097–98 (1 Cir.), *cert. granted*, 444 U.S. 989 (1979);

---

**10.** That Rueda's actions also were susceptible of an innocent interpretation does not warrant a contrary holding. "[A]n officer need not be able to negate all possible lawful explanations

of a situation before making an arrest." *United States v. Rodriguez*, 532 F.2d 834, 838 (2 Cir. 1976).

*United States v. Whitaker,* 592 F.2d 826, 828 n. 2 (5 Cir.), *cert. denied,* 444 U.S. 950 (1979); *United States v. Ochs,* 595 F.2d 1247, 1252–53 (2 Cir.), *cert. denied,* 444 U.S. 955 (1979); *United States v. Culbert,* 595 F.2d 481, 481–82 (9 Cir. 1979) (per curiam). "[A] court must still ask whether the complaining party possessed a fourth amendment interest impinged by the search, before considering whether the search was 'reasonable.'" *The Supreme Court, 1978 Term,* 93 Harv.L.Rev. 60, 176 (1979).[11]

Our initial inquiry, therefore, is whether appellants are entitled to challenge the agents' entry into Room 1701. This in turn depends upon whether appellants had a legitimate expectation of privacy in the room. *Rakas v. Illinois, supra,* 439 U.S. at 143; *United States v. Ochs, supra,* 595 F.2d at 1252–53. There is no doubt that Agapito and Calderon had such expectation of privacy. As the lawful occupants of the room, they clearly have standing to challenge the entry.

Rueda's claim, however, is on a different footing. He was a mere visitor in the room. In *Rakas* the Court stated that "a casual visitor who walks into a house one minute before a search of the house commences and leaves one minute after the search ends" has no expectation of privacy in the house and "it advances no purpose served by the Fourth Amendment to permit [the visitor] to object to the lawfulness of the search." 439 U.S. at 142. This applies to Rueda. We hold that he fails the legitimate expectation of privacy test. *United States v. Hodge,* 594 F.2d 1163, 1165 (7 Cir. 1979).

■ This does not end our inquiry, however, with respect to Rueda's standing claim. He is entitled to challenge the entry under the automatic standing rule of *Jones v. United States,* 362 U.S. 257 (1960). Under that rule, a defendant is granted standing to challenge a search or seizure when

the same possession needed to establish standing is an essential element of the offense charged. *Id.* at 261–63. That is the situation with respect to Rueda here. The current rationale for the rule is that it eliminates the vice of prosecutorial self-contradiction, i. e., allowing the government to charge possession as an element of the crime and at the same time deny that there was possession sufficient to establish standing to challenge a search and seizure. *United States v. Penco,* 612 F.2d 19, 22 (2 Cir. 1979).

The effect of *Rakas* on the automatic standing rule is unclear. *United States v. Ochs, supra,* 595 F.2d at 1253 n. 4; cf. *Rakas v. Illinois, supra,* 439 U.S. at 135 n. 4. The Court in *Rakas* did state that even casual visitors could "contest the lawfulness of the seizure of evidence or the search if their own property were seized during the search." *Id.* at 143 n. 11. The Ninth Circuit has read this to mean that the Supreme Court has reaffirmed in principle the automatic standing rule. *United States v. Mazzelli,* 595 F.2d 1157, 1159–60 (9 Cir.), *petition for cert. filed* (1979). In any event, the rationale behind the rule—the elimination of prosecutorial self-contradiction—remains sound. We hold under the circumstances of this case, and until we are instructed otherwise, that *Rakas* does not foreclose Rueda and defendants similarly situated from invoking the automatic standing rule.[12]

Applying the principles of the automatic standing rule to Rueda, he was entitled to challenge the entry into Room 1701 with respect to the charge that he was in possession of the one kilogram of cocaine found in Room 1701. Possession of that cocaine was an essential element of the offense of possession with intent to distribute charged in Count Four. The automatic standing rule therefore is applicable to Rueda on that count. *United States v. Penco, supra,* 612 F.2d at 23.

---

11. The same commentator notes that *Rakas* "appears to have more conceptual than practical effect. . . . [The] initial inquiry is precisely the same question that many courts have long asked under the rubric of 'standing.'" 93 Harv.L.Rev. at 176.

12. Other Circuits also have continued to apply the automatic standing rule following *Rakas. United States v. Byers,* 600 F.2d 1130, 1132 (5 Cir. 1979); *United States v. Salvucci, supra,* 599 F.2d at 1097–98; *United States v. Mazzelli, supra,* 595 F.2d at 1159–60.

Rueda, however, was not entitled to invoke the automatic standing rule to challenge the entry into Room 1701 with respect to the conspiracy with which Rueda was charged in Count One. "[T]he conspiracy count does not bring into play the automatic standing rule. . . . Possession is 'neither a necessary . . . or a sufficient' element of the conspiracy charge and therefore the test for automatic standing . . . is not satisfied." *Id.* (quoting *United States v. Oates*, 560 F.2d 45, 55–56 & n. 6 (2 Cir. 1977)).

We also must consider whether Rueda has automatic standing to challenge the illegal entry with respect to Count Two which charges him with possession of the six kilograms of cocaine found in Atehortua's apartment. The agents discovered this cocaine as a result of the phone calls from Atehortua which they intercepted following their entry into Room 1701. Thus, the entry into Room 1701, if it was illegal, would affect the conviction on Count Two. We conclude, however, that Rueda is not entitled to avail himself of the automatic standing rule with respect to Count Two. The rule relates to possessory offenses for contraband found in premises allegedly entered illegally, not in an apartment located on the other side of the city. "The vice of allowing the Government to allege possession as part of the crime charged, and yet deny that there was possession sufficient for standing purposes, is not present." *Brown v. United States*, 411 U.S. 223, 229 (1973). Here the government charged possession of the cocaine found in Atehortua's apartment but denied that Rueda had a possessory interest in Room 1701. These are not "contradictory positions." *Id.*

Thus, Rueda cannot object to the entry into Room 1701 insofar as it relates to his conviction for the possession of the cocaine found in Atehortua's apartment.[13]

To summarize under this section of our opinion: we hold (1) that, since Agapito and Calderon had a legitimate expectation of privacy in Room 1701, they were entitled to challenge the agents' entry into that room with respect to the search and evidence seized for use on all counts in which they were named; and (2) that Rueda, under the automatic standing rule, also was entitled to challenge the entry into Room 1701, but only with respect to the charge that he was in possession of the one kilogram of cocaine found in Room 1701.

## B.

To the extent that appellants have standing to assert their claims that the agents' entry into Room 1701 was illegal, we turn now to the merits of their claims.

The general rule of course is that a warrantless search of a dwelling or, as in this case, a hotel room, is constitutionally prohibited, even though there may be probable cause for the search. *Vale v. Louisiana*, 399 U.S. 30, 34 (1970); *Chimel v. California*, 395 U.S. 752, 760–62 (1969).[14] Under certain circumstances, however, immediately following an arrest, law enforcement officers without a warrant may be permitted to conduct a security check—a very quick and limited pass through the premises to check for third persons who may destroy evidence or pose a threat to the officers. *United States v. Christophe*, 470 F.2d 865, 869 (2 Cir. 1972), *cert. denied*, 411 U.S. 964 (1973).[15]

---

**13.** Since the events leading to the charge against Rueda in Count Three—carrying a firearm during the commission of a federal felony—all occurred prior to the entry into Room 1701, his conviction under that count is unaffected by the entry.

**14.** The general rule is subject to "a few specifically established and well-delineated exceptions." *Katz v. United States, supra*, 389 U.S. at 357. *E. g., Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (consent); *Chimel v. California, supra*, 395 U.S. at 762–63 (search inci-

dent to an arrest); *Warden v. Hayden*, 387 U.S. 294, 298–99 (1967) (hot pursuit). None of these exceptions is applicable here.

**15.** Our recent decision in *United States v. Dien*, 609 F.2d 1038 (2 Cir. 1979), *modified on rehearing*, 615 F.2d 10 (2 Cir. 1980), does not control this case. In *Dien* federal agents entered the premises of a suspect and proceeded to question him. Subsequently the agents conducted a warrantless search of a concealed area of a room and, after detecting the odor of raw marijuana, arrested the suspect. We rejected the

The reasonableness of a security check is simple and straightforward. From the standpoint of the individual, the intrusion on his privacy is slight; the search is cursory in nature and is intended to uncover only "persons, not things." *United States v. Bowdach*, 561 F.2d 1160, 1168 (5 Cir. 1977). Once the security check has been completed and the premises secured, no further search—be it extended or limited—is permitted until a warrant is obtained. From the standpoint of the public, its interest in a security check is weighty. The delay attendant upon obtaining a warrant could enable accomplices lurking in another room to destroy evidence. More important, the safety of the arresting officers or members of the public may be jeopardized. Weighing the public interest against the modest intrusion on the privacy of the individual, *Pennsylvania v. Mimms*, 434 U.S. 106, 108–09 (1977); *Terry v. Ohio*, 392 U.S. 1, 20–21 (1968), a security check conducted under the circumstances stated above satisfies the reasonableness requirement of the Fourth Amendment.

■ In the instant case, the agents' entry into Room 1701 cannot be justified as a security check. The agents had the room under constant surveillance for two days. Any belief by the agents that third persons were in the room would not have been reasonable. If anything, their surveillance indicated that the room was empty.

Agents in Room 1702, the adjoining room, eavesdropped on conversations in Room 1701. An agent in Room 1708 monitored the hallway outside the room. At one point the agents had looked into the room through its open door. At no time did the agents hear or see anyone in the room other than appellants,[16] who by the time of the entry were under arrest. Under these circumstances, the security check exception to the warrant requirement is inapplicable.

■ The government's reliance on *United States v. Christophe, supra*, we believe is misplaced.[17] The instant case is sharply distinguishable. The security check in *Christophe* followed a lawful arrest *inside* the premises. In contrast, the arrests of Agapito and Calderon took place in the hotel lobby—seventeen floors removed from Room 1701. Thus, even if the agents here thought that accomplices remained in the room, there was no reason for them to believe that the accomplices knew of the arrests so that they might destroy evidence or somehow "attack" the agents.[18]

■ The government's attempted justification of the entry in the instant case as a security check is subject to another infirmity. As stated above, we view the intrusion on privacy occasioned by a security check to be minimal; a determination of whether third persons are on the premises requires neither a lengthy nor disruptive stay. *United States v. Jackson*, 533 F.2d

government's attempted justification of the search as a security check. As our opinion explains, *Dien* clearly was not a security check case. The search was not made immediately upon entering the room, thereby undermining the agents' claim that they were looking for others. *Id.* at 1047.

16. We of course exclude the small boy who entered and left the room with Rueda.

17. *United States v. Diaz*, 577 F.2d 821 (2 Cir. 1978), also cited by the government, we think is not pertinent. Although there was a security check following an arrest inside the premises, *id.* at 823, our opinion does not comment on the propriety of the security check. It dealt with the agents' *presence* on the premises following the security check, as opposed to the legality of the *entry* into the premises. *Id.* at 823–24.

18. We do not suggest that law enforcement officers who arrest an individual outside the premises never may conduct a security check inside the premises. *United States v. Baker*, 577 F.2d 1147, 1152 (4 Cir.), *cert. denied*, 439 U.S. 850 (1978); *United States v. Bowdach, supra*, 561 F.2d at 1168–69. We hold only that in such a case, the arresting officers must have (1) a reasonable belief that third persons are inside, and (2) a reasonable belief that the third persons are aware of the arrest outside the premises so that they might destroy evidence, escape or jeopardize the safety of the officers or the public. *Cf. United States v. Campbell*, 581 F.2d 22, 25 (2 Cir. 1978) (exigent circumstances needed for warrantless entry into home to make an arrest supported by probable cause); *United States v. Reed*, 572 F.2d 412, 424 (2 Cir.) (same), *cert. denied*, 439 U.S. 871 (1978).

314, 316 (6 Cir. 1976). The intrusiveness of this security check was far from minimal. Following their entry, the agents were in Room 1701 intermittently until the search warrant was obtained almost twenty-four hours later. They seized a suitcase, intercepted phone calls, and arranged for the room to be used as overnight sleeping quarters for Atehortua. In short, they moved in. Once it was determined that third persons were not present, the agents should have left the room.[19] The public interest thereafter in securing the room, located on the seventeenth floor of a hotel, could have been served just as well by stationing a guard outside the door.

In view of the intrusiveness of the agents' stay and the fact that their surveillance should have indicated to them that no one else was in the room, we hold that the warrantless entry into Room 1701 cannot be justified as a security check and was illegal.[20]

### C.

Finally, this brings us to the effect of the illegal entry on appellants' convictions. We hold that the convictions of all appellants on all counts must be affirmed.

Rueda's conviction for carrying a firearm during the commission of a federal felony may be disposed of summarily. His arrest and the subsequent discovery of his gun occurred prior to the illegal entry. His conviction, therefore, is unaffected if he was engaged in the commission of a federal felony while carrying the gun. We conclude that he was. His conviction on Count Three is affirmed.

■ As for Rueda's conviction for possession of the six kilograms of cocaine found in Atehortua's apartment, we have held that Rueda was not entitled to challenge the illegal entry into Room 1701 with respect to that count. His conviction on Count Two is affirmed.[21]

In reviewing appellants' convictions on Counts One and Four which charged, respectively, conspiracy and possession with intent to distribute one kilogram of cocaine found in Room 1701, we have held that Agapito and Calderon have standing to challenge the entry with respect to their convictions on both of these counts; but that Rueda is entitled to challenge the en-

---

**19.** We distinguish cases where third persons are discovered on the premises whom the agents do not have probable cause to arrest but who nevertheless might destroy evidence. *E. g., United States v. Diaz, supra,* 572 F.2d at 823–24 (defendant's roommate); *United States v. Christophe, supra,* 470 F.2d at 869 (defendant's wife). Under these circumstances, arresting officers may have to remain on the premises following a security check. As Judge Friendly stated in *Diaz,* there may be "no other practical means" of securing the premises until a warrant can be obtained. 572 F.2d at 824 n. 3.

**20.** The district court also found the entry proper because the agents reasonably believed that associates of appellants would make phone calls in furtherance of their criminal activity. It reasoned that "[t]he paramount importance of continuing the investigation and possibly discovering the identity of other members of this conspiracy" justified the entry. Even assuming that the agents had such a belief, the district court's approach appears to have no support in the case law, so far as we know. There is no "continuing the investigation" exception to the warrant requirement and we decline to create one. *United States v. Campbell, supra,* 581 F.2d at 25–26, cited by the

district court, we do not believe supports the court's approach. There we stated that officers with a reasonable belief that a suspect may escape, destroy evidence or continue the commission of an ongoing crime were entitled to make a warrantless entry into a home in order to arrest the suspect. *Id.* at 26. We did not suggest that an officer's interest in continuing an investigation after an arrest constituted a sufficient exigent circumstance to justify a warrantless search.

**21.** Rueda also challenges the search of Atehortua's apartment on the ground that she did not voluntarily consent to the search. We disagree. There is no indication in the record that her consent was coerced. Rueda's principal argument is that Atehortua's initial verbal consent was involuntary because the agents did not inform her that she could refuse permission to search. But knowledge of the right to refuse, though a factor in determining voluntariness, is not a prerequisite to a consent search. *Schneckloth v. Bustamonte, supra,* 412 U.S. at 249. Moreover, the agents informed Atehortua of her right to refuse before she signed the written consent form.

try only with respect to Count Four, the possession count. For the reasons that follow, we hold that the convictions of these appellants on each of these counts must be affirmed.

■■■ Although the agents seized the suitcase in Room 1701 which contained the cocaine, they did not open it until after the warrant had been obtained. The one kilogram of cocaine, therefore, was admissible if the warrant was valid. *United States v. Christophe, supra,* 470 F.2d at 869. The affidavit in support of the warrant, however, refers to the cocaine, money and drug paraphernalia seized at Atehortua's apartment. Assuming that these items were tainted because they were obtained directly as a result of the telephone calls intercepted during the agents' illegal stay in Room 1701, we nevertheless hold that this does not compel reversal of the convictions, for the following reasons.

Two untainted portions of the affidavit contain a sufficient showing of probable cause to render the warrant valid, despite the reference to tainted events which occurred after the illegal entry. *United States v. Giordano,* 416 U.S. 505, 554–56 (1974) (Powell, J., concurring in part and dissenting in part) (collecting cases); *Parts Mfg. Corp. v. Lynch,* 129 F.2d 841, 842–43 (2 Cir.), *cert. denied,* 317 U.S. 674 (1942); *United States v. Cognato,* 408 F.Supp. 1000, 1005 (D.Conn.) (Newman, J.), *aff'd mem.,* 539 F.2d 703 (2 Cir. 1976), *cert. denied,* 430 U.S. 956 (1977). First, Rueda's confession that he had delivered cocaine to Room 1701 established probable cause that cocaine was in the room. Second, the reliable information furnished by Mr. X, which was corroborated by the agents' own observations, provided ample probable cause. True, the past reliability of Mr. X was not set forth in the affidavit and cannot be considered in assessing the validity of the warrant. *Aguilar v. Texas, supra,* 378 U.S. at 109 n. 1. But "[s]pecific allegations of reliability or past reliable contact are not required when the informant in question [here Mr. X] was an eyewitness to the crime." *United States v. Rollins, supra,* 522 F.2d at 164. As stated above, the information supplied by Mr. X indicated that it was based on first-hand observation.

Since the warrant was validly issued, the evidence seized pursuant to the warrant was admissible. That evidence, primarily the one kilogram of cocaine found in the suitcase in Room 1701, constituted overwhelming proof of guilt on the counts which charged conspiracy and possession with intent to distribute one kilogram of cocaine. The convictions of all appellants on Counts One and Four are affirmed.

## V.

To summarize:

(1) The agents did not violate the Fourth Amendment when they pressed their ears against the door connecting Rooms 1701 and 1702 in order to overhear appellants conversations.

(2) The agents had probable cause to arrest appellants.

(3) (a) Agapito and Calderon had a legitimate expectation of privacy in Room 1701 and were entitled to challenge the agents' entry into the room. Rueda was entitled to challenge the entry under the automatic standing rule, but only with respect to the charge that he was in possession of the one kilogram of cocaine found in Room 1701.

(b) The agents' warrantless entry into Room 1701, not being justified as a security check, was illegal.

(c) Despite the illegal entry, since the search warrant used to seize the one kilogram of cocaine in Room 1701 was valid, appellants' convictions on Counts One and Four for conspiracy and possession with intent to distribute that cocaine are affirmed.

(d) Rueda's convictions on Counts Two and Three are affirmed.

We have considered carefully appellants' other claims of error and find them to be without merit.

Affirmed.