**UNITED STATES of America**

**v.**

**Walter BURNETT III, Carl Kipp Burnett, Thomas Cook and Hermann Wallner, Defendants.**

**Crim. No. 80–CR–32.**

United States District Court,
N. D. New York.

July 9, 1980.

---

George H. Lowe, U. S. Atty., N. D. N. Y., Albany, N. Y., for United States, U. S. Post Office & Courthouse, by Terrance M. Kelly, Asst. U. S. Atty., Albany, N. Y.

Clute, Clute & Thompson, Plattsburgh, N. Y., for defendant Walter Burnett III by Penelope D. Clute, Plattsburgh, N. Y.

Richard S. Cooper, Knoxville, Tenn., for defendant Carl Kipp Burnett.

O'Connell & Wolfe, Plattsburgh, N. Y., for defendant Thomas Cook by J. Byron O'Connell, Plattsburgh, N. Y.

Meconi & Meconi, Plattsburgh, N. Y., for defendant Hermann Wallner by Louis P. Meconi, Plattsburgh, N. Y.

## OPINION

MacMAHON, District Judge.*

Defendants Walter Burnett III and Thomas Cook moved before the Honorable Neal P. McCurn to suppress statements overheard by government agents in two motel rooms in Burlington, Vermont, and Plattsburgh, New York, as well as marijuana later seized from a van leased by Cook.[1] Judge McCurn referred the suppression motion to us.

---

\* Chief Judge of the United States District Court for the Southern District of New York, sitting by designation.

1. Hermann Wallner, a co-defendant in this case, originally joined in the motion to suppress but was acquitted by the jury.

We held a hearing on May 29 and June 16–18, 1980 and denied the motion prior to trial.[2] This opinion constitutes our findings of fact and conclusions of law with respect to the suppression motion.

The facts relevant to this motion, as set out in the papers and developed at the hearing, appear as follows:

On March 19, 1980, Carl Kipp Burnett, who is Walter Burnett's brother and also a co-defendant in this case, was observed crossing the border between Canada and the United States into Vermont in a dark brown or black Dodge van with Ontario license plates. Customs officials stopped and searched the vehicle and found two secret compartments which they were unable to inspect because they lacked a specially designed tool necessary to open them. No contraband was found elsewhere in the van, but, nevertheless, United States Customs alerted agents of the Federal Drug Enforcement Administration who placed the van under surveillance after it had crossed the border into Vermont.

On March 20, Carl Kipp Burnett drove the van to the Holiday Inn in Burlington. After parking the van, he went to a room rented to his brother Walter. DEA agents rented an adjoining room and removed a plastic face plate from an electrical outlet in the wall of their own room in an attempt to overhear the suspects' conversations. Although the agents could overhear Walter's telephone conversations and other sounds coming from the neighboring room, nothing of a criminal nature came to light. Later that day, Walter and Carl Kipp Burnett drove to the Burlington airport where Carl Kipp boarded a commercial flight; Walter returned to his room at the Holiday Inn.

On March 21, Walter Burnett drove the van to Plattsburgh, New York, where he checked into Room 458 of the Holiday Inn. This time, the agents rented both Room 460, which had a common wall with Room 458, as well as a room across the hall from

which they could observe the Dodge van in the motel parking lot.

The wall separating Room 458 from Room 460 was constructed of masonry approximately eight inches thick. There was no door connecting the rooms. Behind the headboard of the bed in the agents' room, some six to twelve inches above the floor, was a plastic face plate through which telephone wires led into the wall. Apparently there was a similar telephone face plate directly opposite leading to Burnett's room. The agents moved the bed out of the way and used a screwdriver to remove the plate from their own side of the wall. For the next several days, they attempted to overhear Burnett's conversations by taking turns lying on the floor and placing an ear near the opening in the wall where the plate had been removed. At no time did the agents use any electronic device to record sounds coming through the wall, nor did they commit a technical trespass into Burnett's room or place anything inside the wall itself.

An acoustical engineer, qualified as an expert witness, testified at the suppression hearing that with the telephone face plate in place no ordinary conversation in Room 458 could possibly be overheard and understood in Room 460. He also testified that when the plate was removed, speech of a normal conversational volume from various places in Room 458 would be only partially intelligible to a listener in Room 460 with his ear close to the opening.

The substance of what the DEA agents overheard from Burnett's room is important since it bears on the existence of probable cause to arrest the defendants and later search the van. The key conversation occurred when Thomas Cook and Hermann Wallner entered Walter Burnett's room on March 24. Special Agent Rabourn testified that a conversation among all three ensued concerning the border stop of Carl Kipp Burnett on March 19; in particular, one of

---

2. Cook and Walter Burnett later pled guilty to one count of the indictment, but, with the government's consent, reserved the right to appeal the denial of their suppression motion.

This practice has been approved by our Court of Appeals. *United States v. Bronstein*, 521 F.2d 459, 460 n.1 (2d Cir. 1975).

them said they could have been convicted of conspiracy if the residue in the traps had been discovered. There was also talk of western Canada being "dry" and that they could make quite a bit of money. Before leaving the room, Cook asked Walter Burnett which one of the traps the "stuff" was in, and Burnett replied that it was in the trap underneath the stove. All three individuals then went out to the parking lot where Cook and Walter Burnett opened the Dodge van and removed some of Walter's clothing. At that point they were all arrested.

After the defendants were in custody, Agent Rabourn drove the van to a United States Customs post in Rouses Point, New York, but no search of the vehicle was made at that time. Later the same day, while still under the control of government agents at Rouses Point, the van was inspected by Champion, a dog specially trained to detect controlled drugs. Under the supervision of a Customs dog handler, Champion first toured the outside of the vehicle where he reacted positively to two tanks beneath the carriage. The van was then opened and Champion taken inside where the dog reacted positively to the stove and a gold metal suitcase. No warrant was obtained in connection with this dog search.

Relying largely on the overheard conversation and the results of the dog search, the government then obtained a warrant to search the van, which led to the discovery of forty pounds of marijuana hidden in a secret compartment under the stove. Cook and Walter Burnett now invoke the Fourth Amendment's prohibition against unreasonable searches and seizures in asking the court to suppress both the statements made in Burnett's hotel rooms and the marijuana later seized in the van.

In *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), the Supreme Court reaffirmed the principle that "Fourth Amendment rights are personal rights [which, like some other constitutional rights,] may not be vicariously asserted."[3] Thus, the Court held that the question in Fourth Amendment cases which had previously come under the rubric of standing since *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), should instead be determined by addressing the substantive issue of whether the proponent of a suppression motion had his *own* Fourth Amendment rights infringed by a challenged search or seizure. This in turn depends on whether the movant himself had a reasonable expectation of privacy in the area searched.

■ We find that Cook lacked any reasonable expectation of privacy in a hotel room which was neither registered in his name nor occupied by him. Although "legitimately on the premises" by virtue of having been invited in by Burnett, Cook had never been in the room before his brief visit on March 24, and on that occasion he was in the room for only a few moments before agents overheard the incriminating statements. Considering that a hotel room gives even its registered occupant only a very limited reasonable expectation of privacy,[4] we do not believe that a casual visitor, such as Cook, is afforded any protection by the Fourth Amendment under these circumstances. Accordingly, we deny his motion to suppress the conversation overheard in the Plattsburgh Holiday Inn.

■ Walter Burnett, on the other hand, could reasonably expect that his privacy interest would receive at least some limited protection since he was the registered occupant of the hotel room and had actually stayed there several days. *United States v. Agapito*, 620 F.2d 324 (2d Cir. 1980). Unquestionably, he did in *fact* believe that his conversations behind the closed door of his room would remain private; the question we must decide, however, is whether that expectation is reasonable under the circumstances of this case.

---

**3.** *Rakas v. Illinois*, 439 U.S. 128, 133–34, 99 S.Ct. 421, 425, 58 L.Ed.2d 387 (1978).

**4.** *United States v. Agapito*, 620 F.2d 324 (2d Cir. 1980).

In *United States v. Agapito, supra,* our Court of Appeals held that government agents did not violate the Fourth Amendment by pressing their ears against a door connecting their hotel room with that of the defendants in an attempt to overhear their conversations. The court stressed three factors in making its decision: First, agents used only their naked ears, unaided by any artificial, mechanical or electronic device. Second, the agents had a legal right to be in the adjoining room. "We decline to restrict their movements in their own room in order to prevent the overhearing of conversations in an adjoining room." [5] The final factor was the reduced privacy afforded by a hotel room when compared with a private residence. "A person in a hotel room therefore takes a greater risk than one in a residence that, instead of neighbors, an adjoining room may contain strangers or, as in this case, even persons with interests adverse to his own." [6]

The only significant factual difference between *Agapito* and this case is that here the agents removed a plastic face plate from their side of the wall to enable them to overhear the defendants' conversations. By thus manipulating the environment, Burnett contends the agents went beyond the range of activities permitted by *Agapito.*

Although the question is not free from doubt, we believe the actions by DEA agents violated no Fourth Amendment rights of Walter Burnett. In so deciding, we find particularly important the reluctance of our Court of Appeals to restrict the movements of government agents in an area where they are legally entitled to be. As long as the agents remained wholly within their own room, we believe the fact they altered that room by removing a face plate accessible only from their side of the wall is the same type of "hair-splitting distinction" which the *Agapito* court declined to make. In addition, since the occupant of a hotel room takes a significant risk that those in the adjoining room may be adverse

to his own interests, it seems fair to expect that a would-be listener might make whatever physical alteration in his own room was necessary to enable him to overhear a conversation next door with his naked ear. Not being familiar with the physical characteristics of the adjoining room, Walter Burnett took the risk that a fortuitously positioned face plate might allow a government agent just such an opportunity.

■ Accordingly, we hold that DEA agents did not violate the Fourth Amendment rights of defendant Walter Burnett by their activities in either the Burlington or Plattsburgh Holiday Inn, and we therefore deny his motion to suppress all conversations overheard in those places. It follows that defendants' March 24 conversation was properly relied upon to support the issuance of the search warrant which led to the discovery of marijuana in the van. We also find that this conversation provided ample probable cause to believe that a cache of marijuana was hidden in the Dodge van and that defendants were engaged in criminal activity at the time of their arrest.

■ The next question we must decide is whether the agents' seizure of the van at the time of defendants' arrest and the warrantless dog search violated the Fourth Amendment rights of either Cook or Walter Burnett. Both men had a privacy interest in the van entitling them to challenge the seizure and search; Cook was the lessee and, as such, had ultimate authority to decide who should have access to the vehicle, while Walter Burnett had actual possession of the van with Cook's written permission. Under these circumstances, both men could legitimately exclude others from using or searching the van, and they therefore have a Fourth Amendment privacy interest in it. *Compare United States v. Smith and Cannon,* 621 F.2d 483 (2d Cir. 1980) (driver of a car who is neither the owner nor lessee and who makes no showing that he is lawfully using the car has no Fourth Amendment rights in it).

5. *Agapito, supra,* at 330.

6. *Agapito, supra,* at 331.

■ Having decided that Cook and Walter Burnett have protectible Fourth Amendment rights in the van, we must go on to consider whether these rights were violated.

In *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), the Supreme Court held admissible evidence seized from an automobile in which the defendants had been riding at the time of their valid arrest, where the search of the car did not occur until it had been driven to the police station. The Court appeared to rely on the exigent circumstances inherent in a vehicle's mobility to justify the later warrantless search, even though the car was securely in police custody and there was consequently little likelihood of it being driven away. 399 U.S. at 51, 90 S.Ct. at 1981.

Later Supreme Court cases make it clear, however, that the rationale for the "automobile exception" to the Fourth Amendment's warrant requirement is not only a vehicle's mobility, but also the reduced reasonable expectation of privacy one may have in a car in contrast to a private home. *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979); *Rakas v. Illinois, supra; United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). As noted by the Court in *Cady v. Dombrowski, supra*, "warrantless searches of vehicles by state officers have been sustained in cases in which the possibilities of the vehicle's being removed or evidence in it destroyed were remote, if not nonexistent." 413 U.S. at 441–442, 93 S.Ct. at 2528. Although evidence has been ruled inadmissible where seized without a warrant from a closed suitcase inside a car, *Arkansas v. Sanders, supra*, from a locked footlocker placed in the open trunk of a car, *United States v. Chadwick, supra*, and from cartons sealed with tape inside a van, *United States v. Dien*, 609 F.2d 1038 (2d Cir. 1979), the rationale for these cases is the increased reasonable expectation of privacy pertaining to sealed personal luggage.

None of these cases can affect the lawfulness of the dog search at issue here, however, since no luggage or other sealed containers were opened while Champion and his handler inspected the vehicle. *See Dien, supra* (opening sealed cartons in van at time of arrest violates the Fourth Amendment, but search of the van itself at the scene of the arrest is constitutionally permissible).

Nor does it matter that the agents seized the van and drove it to the Customs post before conducting the search. The "probable-cause factor" to search the vehicle at the scene of the arrest "still obtained at the station house." *Chambers v. Maroney, supra*, 399 U.S. at 52, 90 S.Ct. at 1981. Moreover, the Supreme Court has upheld the seizure of a car upon the arrest of its occupants and a later search at the police station even where there was no indication that an immediate on-the-scene search of the car would have been impractical. *Texas v. White*, 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975).

The case law is thus clear that under these circumstances, the warrantless seizure and removal of the Dodge van, as well as the later dog search of its interior, did not violate any of defendants' Fourth Amendment rights. The dog's positive response to various parts of the van was therefore properly used in the government's affidavit to obtain the search warrant which ultimately led to the discovery of the marijuana hidden in a trap under the stove. Movants' attempt to suppress the marijuana at trial must consequently fail.

Accordingly, we deny defendants' motion to suppress as to both the statements overheard by DEA agents in the motel rooms and the marijuana seized from defendants' van.

So ordered.