**UNITED STATES of America,**

v.

**Dario Zapata SERNA, Defendant.**

**No. 85 Cr. 611 (RWS).**

United States District Court,
S.D. New York.

Dec. 19, 1985.

See also, D.C., 630 F.Supp. 779.

Rudolph W. Giuliani, U.S. Atty., S.D.N.Y. (Steven Kaplan, Asst. U.S. Atty., New York City, of counsel), for U.S.

Irving Cohen, New York City, for defendant.

## OPINION

SWEET, District Judge.

Defendant Dario Zapata Serna ("Serna") has moved pursuant to Rule 12(b)(3) and Rule 41(f) of the Federal Rules of Criminal Procedure to suppress evidence which the government obtained during his arrest and in a later search of his home on June 19 and 20, 1985. For the reasons set forth below, an evidentiary hearing is required to determine whether the initial occupation of the home was a limited security check or a warrantless search of the premises, and to determine whether the Ceballos' consent to search was a voluntary waiver of Fourth Amendment rights. The government has, however, established that it had sufficient probable cause to support both the arrest

and the search of Serna's home and that the trash searches were entirely proper.

Serna is charged, pursuant to 21 U.S.C. § 846, with participation in a conspiracy to possess cocaine with intent to distribute and to launder the proceeds of that cocaine trade by transporting monetary instruments out of the United States in violation of 31 U.S.C. § 5316. Serna seeks to suppress all items found on his person during his arrest, all items found as a result of the search of his home, and all items found as a result of the searches of trash outside his home. The government contends that it established probable cause for the arrest and search as a matter of law, and that illegal entry into a home cannot taint evidence collected under a later search warrant issued on the basis of independently obtained probable cause.

**Facts**

On May 11, 1985, the New York Drug Enforcement Task Force ("NYDETF" or "Agents") commenced an investigation of Serna, a Colombian national residing in Queens, New York, in connection with a nationwide investigation into a cocaine smuggling and distribution organization allegedly headed by Juan Ramon Matta-Ballesteros ("Ballesteros"). The NYDETF placed Serna under periodic surveillance for five weeks, observing him at his home located at 225–05 Horace Harding Boulevard in Queens, New York, following his car, and searching his trash which had been placed outside his home for collection.

On the evening of June 19, 1985, the Agents had Serna under surveillance as he drove through Queens. At approximately 8:00 p.m. Serna was arrested suddenly, allegedly because he detected this surveillance. Serna claims that the Agents physically abused and threatened him during the course of the arrest and attempted to extract a consent to search his home during the arrest. According to Serna, he refused to consent and his repeated requests for an attorney were unheeded. It is undisputed that the Agents then drove Serna to the home on Horace Harding Boulevard where Serna resided with Luis Albeiro Ceballos

and Theresa Darlene Ceballos and their infant child. According to the government, Serna's wife also occupies this house. Serna, however, claims that she resides in Miami, Florida. Serna and the Ceballos family shared the rent for these premises and shared the common rooms of the home, with Serna's private quarters located on a lower floor of the house.

While Serna was held in custody in an official car in the driveway, the Agents attempted to enter the home without a search warrant at approximately 9:45 p.m. on June 19. According to the government, the Agents requested entry and were denied such entry by Theresa Darlene Ceballos, who was home alone with her child. The Agents then showed their badges, identified themselves, and forced their way through the front door, believing that there was drug related contraband inside which was in danger of being destroyed. The Agents then conducted a "security check" of the home to determine if anyone else was present and remained in the common rooms until a search warrant for Serna's quarters was obtained at approximately 1:20 p.m. on June 20, 1985, the following day.

Mrs. Ceballos tells a different version of the concededly forced and warrantless entry. She contends that the Agents did not identify themselves but simply broke through the door with weapons drawn, terrorized her and her infant, and began a systematic search of the entire house.

Meanwhile, also on the evening of June 19, 1985, Luis Albeiro Ceballos, also a Colombian national, was detained by Agents as he was leaving a baseball game at Shea Stadium. Although Ceballos was held in custody for approximately twenty-four hours, he was never arrested, and no charges were filed against him. It is undisputed that Ceballos was taken back to the home he shared with Serna on Horace Harding Boulevard and that he and his wife then signed a "consent to search" form at approximately 1:10 a.m. on June 20, 1985. However, Mr. and Mrs. Ceballos claim that this consent was coerced by vari-

ous threats from the agents, including the ultimatum that their child would be taken from them if they did not consent to the search.

A large number of agents remained at the Serna-Ceballos home throughout the evening. The nature and area of the search is hotly contested. Luis and Theresa Ceballos contend that the Agents searched the entire home upon initial entry, and did not restrict their search to a "security check", nor did they restrain their "consent search" to the common areas of the home. The government contends that it followed the initial entry by a security check, and that no further search was undertaken until the Ceballos' consented to a search of the premises. Only after the warrant to search Serna's premises was obtained did they search Serna's "apartment" downstairs. The Agents finally left the Serna-Ceballos residence at 7:00 p.m. on June 20, 1985, over twenty-one hours after entering the house. Various items were seized in this search in addition to the items which were found in Serna's possession at the time of his arrest and the items which had been found in the trash outside the Serna-Ceballos home.

During the late evening of June 19, 1985 and into the morning of June 20, 1985 the Assistant United States Attorney and NY-DETF prepared and filed a complaint against Serna in the Southern District of New York, charging Serna with participation in a conspiracy to possess cocaine with intent to distribute and with an attempt to launder the proceeds of those sales by transporting unreported monetary instruments out of the United States. As probable cause for both the arrest of Serna and the issuance of the search warrant, the government alleged in its complaint: 1) information from a "confidential informant" detailing the existence of an international cocaine smuggling organization headed by Ballesteros which distributed drugs in, among other places, New York City, 2) information derived from a taped interview of Hippolito Rivera-Ramirez, who had been convicted in California of possession of 115 pounds of cocaine and who had stated that the 115 pounds of cocaine belonged to Ballesteros and that money to finance a deal involving this cocaine was brought from New York City by "Dario," an employee of Ballesteros, 3) information derived from ledgers seized in California showing that in July, 1981, in New York City, "Dario" sold 100 kilograms of cocaine to Rivera-Ramirez in return for $4.7 million, 4) information provided by the Spanish Police that Ballesteros, who was residing in Madrid, was in touch with "Dario," a/k/a "Cucho," in New York City at a phone located at 225–05 Horace Harding Boulevard and that "Dario" was a principal figure in Ballesteros' cocaine organization, and 5) information derived from various documents found in Serna's trash, as well as observations from the five-week surveillance of Serna. The government's recital of the evidence supporting the existence of probable cause for the Serna arrest was provided by the affidavit of NYDETF Special Agent Gerald Murphy.

Following issuance of this complaint, the Assistant United States Attorney obtained a warrant from the Eastern District of New York to search Serna's home. The supporting affidavit provided by NYDETF Agent Thomas Deignan incorporated all of the probable cause allegations contained in the Murphy affidavit attached to the complaint, as well as predictions of what narcotics-related contraband would be found in the house. The aforementioned search conducted pursuant to this warrant took place on the afternoon of June 20, 1985.

Appearing before Magistrate Grubin on June 20, 1985, Serna's appointed counsel moved to dismiss the complaint for lack of probable cause, which motion was denied. One week later before Magistrate Washington, Serna's retained counsel again moved to dismiss the complaint, and the motion was denied.

## Discussion

The government contends that its citation of the Supreme Court's recent decision in *Segura v. United States*, —— U.S. ——, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) obvi-

ates the need for an evidentiary hearing on the defendant's suppression motion. According to the government, Serna's Fourth Amendment objections to both the pre and post search warrant improprieties of the entry into the Serna-Ceballos home are legally insufficient to warrant an evidentiary hearing because this case falls under the Supreme Court's exception for warrantless "seizures" of possessory interests in the home and for the search warrants based on independently obtained probable cause. This court concludes, however, that Serna's affidavits have raised factual doubts as to whether the government falls under the limited circumstances outlined in the *Segura* opinion and that an evidentiary hearing is required to resolve these factual disputes.

The relevant facts in *Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 597 (1984) are set out briefly as follows. The NYDETF had the *Segura* defendants under surveillance on information that these defendants had been trafficking in cocaine from their apartment. On the evening of the arrest and search in question, NYDETF agents arrested Segura in the lobby of the apartment building occupied by other suspects in the alleged drug conspiracy. The agents arrested these additional suspects and made limited security check of the apartment despite the fact that a warrant to search the apartment could not be obtained until the following day. The NYDETF agents took Segura upstairs to the apartment of the additional suspects and entered the apartment without requesting or receiving permission from the occupants. While securing the premises to prevent destruction of evidence, the agents observed, in plain view, various drug paraphernalia. The occupant of the apartment was then arrested, and two agents remained in the apartment until a search warrant was obtained nineteen hours after the initial entry.

The Court posed and resolved the Fourth Amendment issues in the following manner:

Resolution of this issue requires us to consider two separate questions: first, whether the entry and internal securing of the premises constituted an impermissible seizure of all the contents of the apartment, seen and unseen; second, whether the evidence first discovered during the search of the apartment pursuant to a valid warrant issued the day after the entry should have been suppressed as fruit of the illegal entry. Our disposition of both questions is carefully limited....

On this first question, we conclude that, assuming that there was a *seizure* of all the contents of the petitioners' apartment when agents secured the premises from within, that seizure did not violate the Fourth amendment. Specifically, we hold that where officers, enter premises, and with probable cause, arrest the occupants who have legitimate possessory interests in its contents and take them into custody and, for no more than the period here involved, secure the premises from within to preserve the status quo while others, in good faith, are in the process of obtaining a warrant, they do not violate the Fourth Amendment's proscription against unreasonable seizures.

The illegality of the initial entry, as we will show, has no bearing on the second question. The resolution of this second question requires that we determine whether the initial entry tainted the discovery of the evidence now challenged. On this issue, we hold that the evidence discovered during the subsequent search of the apartment the following day pursuant to the valid search warrant issued wholly on information known to the officers before the entry into the apartment need not have been suppressed as "fruit" of the illegal entry because the warrant and the information on which it was based were unrelated to the entry and therefore constituted an independent source for the evidence under *Silverthorne Lumber Co. v. United States*,

251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

*Id.*, 104 S.Ct. at 3382–83.

The government contends that as a matter of law its "security check" of the Serna-Ceballos home was not an unreasonable search or seizure under the Fourth Amendment and that even if it was an illegal search, its securing of a later search warrant on the basis of independent sources of evidence attenuated whatever taint resulted from the initial illegal entry into the apartment. These contentions will be addressed in turn.

## I. Pre Warrant Security Check

The government contends that the period between the initial entry of the home at approximately 9:45 p.m. and the obtaining of the Ceballos consent search at approximately 1:10 a.m., constituted a limited security check of the premises. While the Supreme Court in *Segura* sanctioned the constitutionality of the "limited security check," the Court noted the presence and underscored the necessity of various indicia of such a limited check. As will be illustrated below, the government in this case has not yet demonstrated that these same indicia of a "seizure" existed in the case at bar, and Serna has submitted several affidavits which throw the nature of this entry into controversy and warrant an evidentiary hearing on this issue. While the *Segura* Court noted that "the heightened protection we accord privacy interests is simply not implicated where a *seizure* of premises, not a search, is at issue," it took pains to "reaffirm at the same time, however, that absent exigent circumstances, a warrantless search—such as that invalidated in *Vale v. Louisiana*, 399 U.S., at 33–34, 90 S.Ct., at 1971–72—is illegal." *Id.* at 3389.

Serna has raised substantial doubts as to whether the agents' occupancy of the home

prior to the obtaining of the consent to search qualifies as a reasonable warrantless seizure or limited security check under the standards set out by the *Segura* Court.[1] The Court's standards bear repeating: "Specifically we hold that where officers, having probable cause, enter premises, and with probable cause, arrest the occupants who have legitimate possessory interests in its contents and take them into custody and, for no more than the period here involved, secure the premises from within to preserve the status quo while others, in good faith, are in the process of obtaining a warrant, they do not violate the Fourth Amendment's proscription against unreasonable seizures." *Id.* at 3382.

These *Segura* seizure requirements contemplate an exigency and immediacy that may have been absent here. It is these requirements of immediacy which root the *Segura* exemption for warrantless security checks in Fourth Amendment culture, and legitimate intrusion into the home, a place which has always enjoyed enhanced Fourth Amendment protection. *See Payton v. New York*, 445 U.S. 573, 585–86, 100 S.Ct. 1371, 1379–80, 63 L.Ed.2d 639 (1980); *United States v. Martinez Fuerte*, 428 U.S. 543, 561, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976) ("the sanctity of private dwellings [is] ordinarily afforded the most stringent fourth amendment protection.") First, Serna was arrested miles from the Horace Harding Boulevard home, and hours before the entry into the home in Flushing Queens, and Ceballos was detained the same evening outside Shea Stadium. Nobody inside the premises was arrested or taken into custody. The only occupants present in the home were Mrs. Ceballos and her child. As the government has admitted, the NYDETF Agents drove Serna back to the apartment and kept him in custody in a car in the driveway, and

---

1. The government does not argue that the Agents acted under "exigent circumstances" that would entitle them to search Serna's home without a search warrant. *See United States v. Agapito*, 620 F.2d 324 (2d Cir.), *cert. denied*, 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980); *United States v. Reed*, 572 F.2d 412 (2d Cir.), *cert. denied*, 439 U.S. 913, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978). The government contends that the entry and occupation of the premises constitutes a limited security check under *Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) and later cases sanctioning the use of limited security checks.

Ceballos was brought back to the apartment and was taken inside after the agents had forced their way into the house. This is the only way that anyone in the home was aware of the arrest and detention of the occupants. These same circumstances reveal another deficiency in the "security check" standards set out in *Segura.* The *Segura* Court contemplated "securing a dwelling, on the basis of probable cause,[2] to prevent the destruction or removal of evidence while a search warrant is being sought." *Id.* Here, however, the government has not demonstrated that any evidence was in danger of being destroyed or removed. The arrests were made far from the house, and the government has offered no evidence to infer that the occupants were aware of these arrests until the agents forced their way into the home, despite the fact that the suspects and their home had been under surveillance for the preceeding five weeks. As the Second Circuit recognized in its later affirmed opinion in *United States v. Segura,* 663 F.2d 411 (2d Cir.1981), *aff'd,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), the agents' own actions in alerting the inhabitants to the existence of police action should not be the basis for a need to secure a home from imminent destruction of evidence:[3]

Such exigency as inhered in these conditions, however, was of the agents own making. They had no need to drag Segura to his apartment or to knock at the door. We will not expand the exception made for security checks by permitting these agents to "create their own exigencies ... and then 'secure' the premises on the theory that the occupants would

otherwise destroy evidence." *United States v. Allard,* 634 F.2d 1182, 1187 (9th Cir.1980); *United States v. Rosselli,* 506 F.2d 627, 630 (7th Cir.1974).

The Second Circuit thus reaffirmed the requirements for warrantless security checks which it set out in *United States v. Agapito,* 620 F.2d 324 (2d Cir.), *cert. denied,* 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980). In *Agapito* the Second Circuit held that to justify a security check the "arresting officers must have 1) a reasonable belief that third persons are inside, and 2) a reasonable belief that the third persons are aware of the arrest outside the premises so that they might destroy evidence, escape or jeopardize the safety of the officers or the public." *Id.* at 336 n. 18. The government has not offered any evidence to rebut Serna's assertions that no destruction of evidence was imminent.

■ Furthermore, under *Segura* the NYDETF Agents bear the burden of demonstrating that they possessed the information underlying the probable cause to search the home *before* the initial break-in. The Court's holding on the validity of a warrantless seizure was carefully worded to include the requirement that the agents have probable cause before entering the premises: "Specifically, we hold that where officers, *having probable cause, enter premises,* and with probable cause arrest the occupants ..." *Segura v. United States, supra,* 104 S.Ct. at 3382.

The necessity of this temporal requirement for the validity of a "limited security check" is evident from the court's treatment of the pre-*Segura* case law support-

---

**2.** Because the same evidence was used to support the existence of probable cause to arrest, enter the home, do a limited security check and obtain a search warrant, the sufficiency of the probable cause underlying this security check will be discussed in the probable cause section *infra.* This will be done with the proviso that the sufficiency of the probable cause inquiry is an important factor in determining the validity of a limited security check.

**3.** The only issue before the Supreme Court in *Segura* was whether the Fourth Amendment required suppression of evidence which was ob-

tained after an illegal entry into the premises but which was followed by a search warrant based on independently obtained information that constituted probable cause to search. As part of this determination, however, the Court addressed the issue of "seizures of possessory interests" in the home or "limited security checks," and affirmed the Second Circuit's holding that the seizure in the case was not a limited security check such as the one sanctioned in *United States v. Agapito,* 620 F.2d 324 (2d Cir.), *cert. denied,* 449 U.S. 834, 101 S.Ct. 107, 66 L.Ed.2d 40 (1980).

ing the validity of warrantless seizures of property. In all three cases highlighted by the Court, the officers had probable cause to seize the property before that seizure was effected. For example, *citing Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), the Court noted that it was "reasonable to seize and impound an automobile on the basis of probable cause, for whatever period is necessary to obtain a warrant for the search." *Segura* at 3387.[4] Discussing *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), the majority remarked "... 'neither the respondents nor the court questioned the validity of the initial warrantless seizure of the footlocker *on the basis of probable cause" Segura v. United States, supra*, 105 S.Ct. at 3388 (emphasis added). The *Segura* majority again emphasized that in *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) the Court "... expressly noted that the police acted not only 'properly' but 'commendably' in seizing the suitcase without a warrant on the basis of probable cause to believe that it contained drugs." (citations omitted). *Id.* It is evident that the *Segura* court transferred this requirement that probable cause precede the seizure of possessory interests when it applied this concept to the arena of the private home, which always has been accorded special solicitude under the Fourth Amendment. *See Payton v. New York, supra*, 445 U.S. at 589, 100 S.Ct. at 1381 (1980). The persistence of this temporal requirement is at the root of the Court's explanation of why its *Segura* holding will not heighten the possibility of illegal entries: "Second, as a practical matter, officers who have probable cause and who are in the process of obtaining a warrant have no reason to enter the premises before the warrant issues, absent exigent circumstances which, of course, would justify the entry. *Segura v. United States, supra*, 104 S.Ct. at 3390. The Court presumes that the agents have probable cause and are securing the premises to maintain the *status quo* while obtaining official imprimatur for the search.

Reading this temporal requirement out of the "limited security check" exception would lead to absurd results, as it would authorize agents to lay seige to the premises to maintain the *status quo* until officers working on the "outside" could obtain probable cause. Because the government has not yet documented that the sources of evidence underlying the later search warrant were obtained prior to the break-in, it will be obliged to do so by affidavit or at the evidentiary suppression hearing on the validity of the security check.

Finally, Serna has produced affidavits casting doubt on whether the agents were, in good faith, attempting to secure a search warrant as expeditiously as possible after the initial entry into the home, as is required by the aforementioned language in *Segura*. *See also United States v. Curry*, 751 F.2d 442 (1st Cir.1984). The government, in its memorandum of law opposing suppression of the evidence, claims that the suddenness of the Serna arrest was responsible for its delay in obtaining the search warrant for the Serna-Ceballos home, as the agents had not assembled the necessary evidence because they had not intended to arrest or search that evening. However, both the duration of the time between the arrest and issuance of the warrant and certain circumstances alleged by Serna indicate that the agents may have had incentives to drag their heels in obtaining a search warrant. Serna's timetable, which the government has not yet controverted, puts the time of his arrest at approximately 8:00 p.m. on the evening of June 19, 1985.

---

**4.** Indeed in *Chambers, supra*, 399 U.S. at 51, 90 S.Ct. at 1981, the Court equated the alternatives of seizing the car and awaiting the search warrant or carrying out an immediate search because the officers were presumed to have probable cause in both situations.

"For Constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." *cited* in *Segura v. United States, supra*, 104 S.Ct. at 3387.

It was not until approximately 1:20 p.m. the next afternoon that a warrant was obtained to search Serna's premises and the home, over seventeen hours after the arrest, and over fifteen hours after the agents entered the Serna-Ceballos home. This protracted delay slips just under the wire of the nineteen hour delay declared the maximum by the *Segura* Court, *Segura v. United States, supra,* 104 S.Ct. at 3383 ("and, for no more than the period here involved, secure the premises from within to preserve the status quo ..."). While the Court noted that delay in securing a warrant in a large metropolitan center is *not* in and of itself evidence of bad faith, *Id.* at 3390, the Court also voiced support for its previous observation in *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) that a seizure reasonable at its inception can become unreasonable because of its duration or for other reasons, and went on to examine the government's reasons for delay in obtaining the warrant. Here the government has offered no facts upon which a finding of unavoidable delay could be inferred.

Contrary to the Supreme Court's observation in *Segura* that "There is no evidence that the agents exploited their presence in the apartment;" *Segura v. United States, supra,* 104 S.Ct. 3390, here Serna has produced evidence of just such abuse. According to Mrs. Ceballos, the agents did not merely await issuance of the warrant, they searched the apartment, threatened her and her husband, and used the premises as their own for that evening and throughout the next day. One agent allegedly took a shower in the apartment while denying Mrs. Ceballos the same privilege.

In view of this affidavit evidence before the court, the period between initial entry into the home at 9:45 p.m. and the Ceballos' consent-to-search at 1:10 a.m. may not qualify as a "limited security check" under *Segura*. The two-hour search would then have been an illegal warrantless search under *Vale v. Louisiana, supra,* 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970), and any evidence taken from the common rooms pursuant to that search would have to be suppressed as a "fruit" of the poisonous entry. An evidentiary hearing is necessary to determine whether this initial "seizure" was indeed an illegal warrantless search, and if it is found to be an illegal search, which items gleaned from this search require suppression.

## II. The Consent Search

According to the government, the agents followed their "limited security check" with a search of the common rooms of the premises that was authorized by the Ceballos' voluntary consent to search. The Ceballos' affidavits allege that this consent was coerced and that the agents threatened, among other things, to take the Ceballos' infant away if they did not cooperate with a house search. Furthermore, Theresa Darlene Ceballos stated that the agents had already searched the home thoroughly before this consent was given. Serna claims that this consent is invalid because it was not freely given, and even if it is valid, it cannot be used to erase the taint upon evidence sought to be introduced against him, because the Ceballos' could not waive his Fourth Amendment interests in the common rooms of the house.

Serna's contention that the Ceballos' consent is invalid against him is incorrect. The Second Circuit, endorsing the Supreme Court's opinion in *United States v. Matlock,* 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), has established that "[c]onsent to search by one with access to the area searched, and either common authority over it, a substantial interest in it or permission to exercise that access, express or implied, alone validates the search." *United States v. Gradowski,* 502 F.2d 563, 564 (2d Cir.1974) (*per curiam* ). The Second Circuit's "third party consent" principle has permitted parties with a relationship far less intimate than that of the Ceballos' and Serna to consent to the search of premises and waive the Fourth Amendment interests in the premises. For example, in *United States v. Pravato,* 505 F.2d 703 (2d Cir.1974), the court permitted the

owner of a single family home to consent to the search of a room which the defendant had rented for three days, and in *United States v. Buettner-Janusch*, 646 F.2d 759 (2d Cir.1981), the "cooperative relationship" that existed between an undergraduate research assistant, a fellow professor and the defendant was enough common authority and express or implied permission to use the defendant's laboratory to permit them to consent to a search of that laboratory. As the Supreme Court explained in *United States v. Matlock, supra*, 415 U.S. at 171 n. 7, 94 S.Ct. at 993 n. 7, the authority which justifies third party consent "rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."

Here the Ceballos admittedly shared the common areas of the home, had equal access to the premises and split the rental price of the home. The demarcation of Serna's private quarters in a downstairs section of the home also reflects on the commonality of the areas that he shared with the Ceballos and in which they had equal use rights. Therefore, if the Ceballos' consent search was voluntary rather than coerced, it would have waived Serna's Fourth Amendment rights in the common areas of the home, and any evidence gathered from those rooms pursuant to the consent search could be used as trial evidence against Serna.

■ However, the government still retains the burden of proving that the Ceballos' consent was given freely and without express or implied coercion. *United States v. Vasquez*, 638 F.2d 507, 524 (2d Cir.1980). While this consent need not be scrutinized for a showing of knowing and intelligent waiver, *Schneckcloth v. Bustamonte*, 412 U.S. 218, 237, 93 S.Ct. 2041, 2052, 36 L.Ed.2d 854 (1973), a consent will be held invalid if it was secured by an officer's claim of official authority to search and if consent was only an acquiescence to such a display of authority. *United States v. Vasquez, supra*, 638 F.2d at 524, citing *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968).

■ The Ceballos' affidavits claim that their consent to search was extracted by the agents under extreme duress. The consent was obtained at approximately 1:10 a.m. on June 20, after the agents had broken into and occupied the premises from 9:45 p.m. the same evening. Mrs. Ceballos claims that the agents threatened to take her infant child away if they did not consent and told the couple that they would be the object of official wrath if the agents had to awaken a judge at such a late hour to issue a search warrant. Mr. Ceballos claims that he acquiesced in the search only to quiet his wife, who was crying and distraught about the threats to remove her child from parental custody. These affidavits have raised sufficient questions as to the validity of the consent to require an evidentiary hearing on the issue. If the consent is deemed coerced, the materials seized from the common rooms of the premises will be suppressed as the product of a warrantless search in violation of the Fourth Amendment.

■ An evidentiary hearing finding that the limited security check was actually an unlawful warrantless search raises the possibility that this court will be faced with an illegal warrantless search from 9:45 p.m. to 1:10 a.m., followed by a valid consent to search the same premises. We can find no authority to suggest that this later consent will erase the taint caused by the first illegal search. While *Segura v. United States, supra*, 104 S.Ct. 3380 stands for the proposition that a later search conducted under the authority of a warrant based on independently obtained probable cause will remove the taint from a prior illegal entry, the Supreme Court did not explicitly apply this principle to consent searches which follow illegal entry. This difficult question will be reserved until the issue is squarely before the court.

## III. Probable Cause

Serna also challenges the independence and validity of the probable cause evidence used to support both his arrest and a subsequent issuance of a search warrant. Specifically, Serna alleges that the search warrant is tainted as a "fruit" of the poisonous warrantless entry and search of the home, and that even if untainted, the supporting affidavit did not contain sufficient evidence to justify the issuance of a search warrant. According to the government, the warrant was supported by abundant probable cause, and inquiry into the prewarrant illegal entry of the NYDETF agents is precluded as a matter of law by *Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), where the Supreme Court held that "whether the initial entry was illegal or not is irrelevant to the admissibility of the challenged evidence because there was an independent source for the warrant under which that evidence was seized. Exclusion of evidence as derivative or fruit of the poisonous tree is not warranted because of that independent source." *Id.*, 104 S.Ct. at 3391.

 The government is correct in stating that the prewarrant illegality or warrantless search of the Serna-Ceballos home cannot taint evidence secured under a later search warrant supported by evidence of probable cause from a source independent of the prior illegal entry. As the Supreme Court stated in *Segura* the illegal entry has no bearing on the question of the admissibility of evidence seized under a later valid warrant:

The illegality of the initial entry, as we will show, has no bearing on the second question. The resolution of this second question requires that we determine whether the initial illegal entry tainted the discovery of the evidence now challenged. On this issue, we hold that the evidence discovered during the subsequent search of the apartment the following day pursuant to the valid search warrant issued wholly on information known to the officers before the entry into the apartment need not have been suppressed as "fruit" of the illegal entry because the warrant and the information on which it was based were unrelated to the entry and therefore constituted an independent source for the evidence ... (citations omitted).

*Segura v. United States, supra,* 104 S.Ct. at 3383.

 Once the government has established that it has an independent source for the information underlying the affidavit in support of probable cause, the evidence obtained pursuant to that warrant is not tainted by the events prior to the warrant search. While Serna has not specifically alleged that any of the information contained in the affidavits was derivative of the long warrantless hours of occupation and later consent search of the common areas, the government has not demonstrated that it possessed these independent sources of probable cause before it broke into the apartment. This temporal requirement for the probable cause evidence, also discussed in connection with the "security check" requirements in Part I, *supra,* is a prerequisite to a finding of genuine independence.

 This requirement was set out by the *Segura* Court in its initial positing of the question presented by the case: "We granted Certiorari to decide whether, because of an earlier illegal entry, the Fourth Amendment requires suppression of evidence seized pursuant to a valid search warrant *which was issued on information obtained by the police before the entry into the residence.*" *Segura v. United States, supra,* 104 S.Ct. at 3382 (emphasis supplied). The Court specifically incorporates this requirement of contemporaneous probable cause in its quoted holding above by limiting the erasure of the taint to instances when the "... warrant issued wholly on information known to the officers before the entry into the apartment ..." *Id.* at 3382. The Court enumerated the facts of the *Segura* break-in along just such lines, concluding that "No information obtained during the initial entry or occupation of the apartment was needed or used

by the agents to secure the warrant. It is therefore beyond dispute that the information possessed by the agents before they entered the apartment constituted an independent source for the discovery and seizure of the evidence now challenged." *Id.* at 3391. Independent source is thus not an incantation, it is a standard of proof, and the government bears the burden of demonstrating that it possessed its probable cause evidence prior to the break-in. The NYDETF Agents will be permitted to document its satisfaction of the prior probable cause requirement at the evidentiary suppression hearing.

### A. Probable Cause for Arrest—The Murphy Affidavit

The affidavit of NYDETF Agent Gerard Murphy, submitted as part of the government's complaint, outlines the government's evidence supporting the existence of probable cause to arrest Serna. Serna contends that this affidavit fails to meet the constitutional standards for the existence of probable cause, particularly in view of the Magistrate's reliance on an unnamed informant, on a taped interview, and on a trash search which Serna contends was illegally conducted. This court concludes, however, that the government has demonstrated that it had sufficient probable cause to believe that Serna was engaged in narcotics trafficking.

As the Supreme Court observed in *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 probable cause to arrest exists "where the facts and circumstances within the [agents] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." The Murphy affidavit consisted of ten paragraphs detailing the links which the NYDETF Agents had assembled connecting Serna to the alleged narcotics conspiracy extending among other places, to Colombia, California, Florida, Mexico, and New York. The affidavit relies on infor-

mation from a "confidential informant" whose reliability was attested to by Murphy; tape recordings of one Hippolito Rivera-Ramirez, a convicted cocaine trafficker, implicating Serna in the conspiracy allegedly headed by Ballesteros; information from street and electronic surveillance of Ballesteros by the Spanish police; NYDETF street surveillance of Serna; municipal records of Serna's aliases which he supplied to obtain a drivers license; material from the trash searches; the Miami arrest of Serna's wife for illegal transportation of financial instruments; and Serna's own identification upon arrest.

Serna challenges this evidence on three general grounds. According to Serna, the use of the informant's information was disreputable hearsay, as no evidence of the reliability of this informant was provided. Under the "totality of the circumstances" approach endorsed by *Illinois v. Gates, supra,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), however, the affiants' attestation of the reliability of the informant, combined with the other evidence set forth in the affidavit, will warrant a magistrate's consideration of the information:

> The diversity of informants' tips, as well as the usefulness of the totality-of-the-circumstances approach to probable cause, is reflected in our prior decisions on the subject. In *Jones v. United States,* 362 U.S. 257, 271 [80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960), we held that probable cause to search petitioners' apartment was established by an affidavit based principally on an informant's tip. The unnamed informant claimed to have purchased narcotics from petitioners at their apartment; the affidavit stated that he had been given correct information from the informant on a prior occasion. This, and the fact that petitioners had admitted to police officers on another occasion that they were narcotics users, sufficed to support the magistrate's determination of probable cause.

*Id.* at 232, 103 S.Ct. at 2329. Where, as here, an affidavit recites facts which cor-

roborate the information provided by the informant and where the affidavit attests to the reliability of and past experience with that informant, the affidavit meets the standards required for crediting that informant's tip. *United States v. Cambindo Valencia,* 609 F.2d 603, 633 (2d Cir.), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2163, 64 L.Ed.2d 795 (1980), *citing United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).

Second, Serna objects to the use of the taped interview and ledger records of Rivera-Ramirez, obtained during his arrest for possession of 115 pounds of cocaine. Rivera-Ramirez stated during this arrest that the drugs belonged to Juan Ramon Matta-Ballesteros and that the money used to finance the drug deal was brought to California by an employee of Ballesteros named "Dario." Ledger records also show that Rivera-Ramirez bought 100 kilograms of cocaine from Dario "Papito" in New York City in July, 1981 for $4.7 million dollars. Serna has produced evidence showing that Rivera-Ramirez recanted all information contained in the tape in a second affidavit filed in connection with a case pending against Juan Ramon Matta-Ballesteros in New York. The government claims that despite Rivera's recantation or current recollection, it can substantiate that these statements were made it has additional statements proving that "Dario" and Serna are the same individual.

Whatever the eventual credit given to the Rivera-Ramirez evidence, the sufficiency of this demonstration of probable cause does not stand or fall on its strength. There is other evidence linking Serna to the alleged cocaine conspiracy, including, *inter alia,* telephone calls between Serna and Ballesteros obtained by the electronic and street surveillance of the Spanish police, extensive financial records of drug sales, coded telephone numbers found in the trash, and Serna's own suspicious conduct observed by the NYDETF agents during five weeks of intensive surveillance. This detailed corroborative evidence satisfies the requirements for probable cause under the Fourth Amendment. As the Supreme Court observed in *Brinegar v. United States,* 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 "In dealing with probable cause, . . . as the name implies, we deal with probabilities. These are not technical, they are the practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."

## B. Probable Cause for the Search Warrant—The Deignan Affidavit

The search warrant which Serna challenges is supported by the affidavit of NYDETF Agent Thomas J. Deignan, which appends the affidavit of NYDETF Agent Gerard Murphy used to support the existence of probable cause to arrest Serna. Serna claims that the Deignan affidavit contains only generalities about what would be found on the searched premises, and does not offer evidence that drug-related contraband would be found in the Serna-Ceballos home on that particular occasion. The government contends that the Deignan and Murphy affidavits combine to establish ample probable cause to support the issuance of the search warrant.

The Deignan affidavit consists of eight paragraphs which will be reviewed in detail. Paragraphs one and two introduce the Agent and the conclusions of the investigation, and incorporate Agent Murphy's affidavit in support of the complaint by reference. Paragraph three describes the method of surveillance, and paragraph four (1–5) repeats the details of the trash search described in the Murphy affidavit with an added subparagraph (5) indicating that the officers found negatives of photographs showing Serna with a woman believed to be his wife. Paragraph five indicates that telephone company records list the phone in Serna's quarters under the name of an alias "Omar Ayala." Paragraph six (a–j) is the heart of the affidavit, as it sets out Agent Deignan's reasons for believing that contraband would be found in the Serna-Ceballos home. It provides in part:

"As detailed in the attached complaint, Dario Zapata Serna is involved in a major

scheme to possess and distribute cocaine and to launder the proceeds thereof. Based on my experience investigating narcotics offenders, which includes participation in numerous searches of businesses and residences of narcotics dealers I have learned:"

and proceeds to list the contraband which drug traffickers typically keep in their homes, including drug packaging materials, records of drug transactions and weapons. Serna contends that this affidavit is merely a repetition of the information contained in Agent Murphy's arrest-warrant affidavit, and is thus constitutionally infirm.

The Supreme Court's recent opinion in *Illinois v. Gates, supra,* 462 U.S. 213, 103 S.Ct. at 2317, sets the standard for evaluating whether the assertions in the Deignan affidavit meet constitutional muster. In *Gates* the Supreme Court rejected the "two-pronged"[5] analysis found in the *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1968) and *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) in favor of a "totality of the circumstances" approach, stating "The task of the issuing magistrate is simply to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to insure that the magistrate had a "substantial basis for ... conclud[ing] that probable cause existed. *Jones v. United States,* 362 U.S. at 271 [80 S.Ct. at 736]." *Illinois v. Gates, supra,* 462 U.S. at 238, 103 S.Ct. at 2332.

▬▬▬▬ The magistrate's initial determination of the existence of probable cause is entitled to substantial deference, *United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965) and all doubts in a close case should be resolved in favor of upholding the validity of the warrant. *United States v. Zucco,* 694 F.2d 44, 46 (2d Cir.1982). Furthermore, a defendant desirous of challenging the validity of the warrant at an evidentiary hearing must make a "substantial showing that the affiant knowingly, intentionally, or with reckless disregard for the truth made false statements and that those false statements were necessary to support a finding of probable cause." *United States v. Figueroa,* 750 F.2d 232, 237 (2d Cir.1984), *accord, Franks v. Delaware,* 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667.

▬▬▬▬ Serna has not demonstrated that his challenge to the probable cause underlying the search warrant surmounts these constitutional hurdles. While the affidavit must contain "enough evidence reasonably to believe that evidence of illegal activity will be present at the specific time and place of the search." (citations omitted); *United States v. Thomas,* 757 F.2d 1359, 1367 (2d Cir.1985), it is only the probability of criminal activity which is required, and not a *prima facie* showing of that criminal activity. *United States v. Travisano,* 724 F.2d 341, 346 (2d Cir.1983), *citing Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

Agent Deignan's affidavit, in conjunction with the Murphy affidavit, contains sufficient evidence to warrant the reasonable belief that criminal activity, in particular narcotics transactions, were being conducted from the Serna-Ceballos home. Five weeks of surveillance revealed that Serna "while driving proceeds in a manner indicative of an attempt to evade surveillance" and "was also observed making numerous calls from pay telephones." (Murphy Affidavit ¶ 8). Surveillance also established that the Horace Harding Boulevard address was his residence, confirming Serna's link to both the house and the Ballesteros drug operation, which was in possession of

---

**5.** In *Aguilar* and *Spinelli* the Supreme Court determined that an affidavit in support of a search warrant had to enunciate an informant's "basis of knowledge" and had to provide suffi-cient facts to establish either the informants "veracity" or the "reliability" of the informant's report.

Serna's (decoded) telephone number at that Queens home. The telephone number was registered in the name of "Omar Ayala," allegedly one of Serna's aliases, the same name under which Serna obtained a drivers license.

Based upon the five week observations of Serna's "street behavior," the probable cause to believe that Serna was engaging in criminal activities, and his undisputed residence at the Horace Harding house, the NYDETF agents inferred that certain indicia of drug trafficking would be found in Serna's home. While Serna contends that Agent Deignan's general experiential predictions are not proper material to put before the magistrate determining probable cause, the Second Circuit has recently held otherwise. *See United States v. Young*, 745 F.2d 733, 758 (2d Cir.1984) (contrary to defendant's claim, the magistrate was entitled to credit agents specialized knowledge about the practices of narcotics dealers) *citing Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). The NYDETF Agents, who had probable cause to believe that Serna was a drug trafficker, made the reasonable inference that his home, connected to the Ballesteros organization by telephone records, would be the repository for the tools of Serna's alleged trade.

The Second Circuit has upheld search warrants with less evidence connecting the premises to the criminal activity against Fourth Amendment challenge. For example, in *United States v. Travisano, supra*, 724 F.2d 341 (2d Cir.1983), the court upheld the validity of a search warrant issued upon the evidence that a White Cadillac with a distinctive vanity plate was parked in front of the residence which was the object of the search warrant. The Court stated that "there was an actionable connection between the residence and the Cadillac used in the robbery so as to remove the Elm Street house and its occupants from the category of innocent householders whose privacy the Fourth Amendment protects." (citations omitted)

In addition, the affidavit at issue has substantially more content than the conclusory affidavits struck down by the Supreme Court in *Nathanson v. United States*, 290 U.S. 41, 54 S.Ct. 11, 78 L.Ed. 159 (1933) and *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), which recited only predictions about the contents of the premises to be searched without relating the facts underlying these conclusions. *See Illinois v. Gates, supra*, 462 U.S. at 227, 103 S.Ct. at 2326.

## VI. The Trash Search

Serna also claims that evidence taken from his trash and later used to establish probable cause for the arrest should also be suppressed and should not lend support to the government's showing of probable cause. This contention has no merit. As the Second Circuit recently stated in *United States v. Terry*, 702 F.2d 299, 309 (2d Cir.1983), "In the absence of evidence indicating intent by the former owner to retain some control over or interest in discarded trash, his placement of it for collection on a public sidewalk is inconsistent with the notion that he retains a privacy interest in it (citations omitted)." Serna has come forward with no such indication of control or interest in the trash and it can therefore be used as a valid indication of his alleged criminal activity.

For the aforementioned reasons, Serna's request for an evidentiary hearing is granted, but will be limited to the determination of the timing of the probable cause information, the nature of the initial occupation of the premises, and the validity and voluntariness of the Ceballos consent to search. Unless counsel for the defendant or the Assistant United States Attorney object to the selection of this hearing date, an evidentiary hearing will be held on January 6, 1986.

IT IS SO ORDERED.