UNITED STATES of America,

v.

**Dario Zapata SERNA, Defendant.**

No. 85 Cr. 611 (RWS).

United States District Court,
S.D. New York.

Feb. 26, 1986.

Rudolph W. Giuliani, U.S. Atty. for S.D.
N.Y., New York City (Steven Kaplan, Asst.
U.S. Atty., of counsel), for U.S.

Irving Cohen, New York City, for defendant.

OPINION

SWEET, District Judge.

Defendant Dario Zapata Serna ("Serna")
has moved pursuant to Rule 12(b)(3) and
Rule 41(f) of the Federal Rules of Criminal
Procedure to suppress evidence which the
government obtained during an arrest and
later search of his home. Serna has also
moved for an order dismissing his indictment pursuant to Rule 48(b) charging that

the government violated his rights under the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* Pursuant to a previous opinion of this court, *United States of America v. Serna,* 625 F.Supp. 548 (S.D.N.Y.1985), Serna's request for an evidentiary hearing was granted, and after considering the evidence presented at the hearing, Serna's motion to suppress the evidence is denied, as is Serna's motion to dismiss the indictment pursuant to Rule 48(b).

**Prior Proceedings**

Serna is charged with participation in a conspiracy to possess cocaine with intent to distribute cocaine pursuant to 21 U.S.C. § 846 and with laundering the proceeds of that trade by transporting monetary instruments outside the United States in violation of 31 U.S.C. § 5316. Serna sought to suppress the evidence of alleged drug paraphernalia obtained from a Drug Enforcement Agency ("DEA") search of his home on June 19 and 20, 1985. This court's opinion of December 19, 1985, whose facts are incorporated herein by reference, held that the circumstances surrounding the government's concededly forced entry into Serna's home, the suspicious circumstances of the consent search of the common rooms of the home obtained from Mr. Luis Albeiro Ceballos and Mrs. Theresa Darlene Ceballos (the "Ceballos") who shared the premises, and the unexplained delay in obtaining the warrant to search Serna's quarters in the shared home necessitated an evidentiary hearing on the events of that evening.

The evidentiary hearing was granted in order to determine whether the facts of the case at bar satisfied the Supreme Court's limited exception to the Fourth Amendment's exclusionary rule set out in *Segura v. United States,* 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984). In *Segura* the Supreme Court held that 1) officers, with probable cause to enter a dwelling, may "seize" its contents or conduct a limited security check of the premises to preserve the *status quo* while others are in good faith obtaining a search warrant without violating the Fourth Amendment's proscription against unreasonable searches and seizures, and that 2) regardless of the legality of the initial entry, evidence later discovered pursuant to a valid search warrant issued on information known to the officers before entry would not be tainted as "fruit" of the illegal entry. *Id.,* 104 S.Ct. at 3382–3383. Three aspects of the search of the Serna residence which related to the three stages of entry and occupation of the home required further evidence with respect to the government's contention that the search fell within the *Segura* exception:

1) Was the "limited security" check of the house from 9:45 p.m., June 19, 1985, to 1:10 a.m., June 20, 1985 a reasonable "seizure" of the premises?

2) Was the Ceballos' consent to search the common rooms voluntarily given or extracted by use of threats and coercion?

3) Was the information contained in the affidavit in support of the search warrant known to the DEA agents in advance of their entry, so as to constitute an "independent source" erasing the taint of the prior illegal entry under *Segura?*

On the morning of January 23, 1986, immediately preceding the evidentiary hearing, the government advised the court by letter that it would not "use at trial or otherwise use against Zapata-Serna any of the material seized from the 'common area' at 225–05 Horace Harding Boulevard." This concession further narrowed the hearing issues, as questions concerning the illegality of entry and the validity of the consent search pertained only to evidence obtained from the common rooms leaving the question as to whether the later warrant for Serna's portion of the house was obtained with an "independent source" for the information in the warrant affidavit. *Segura v. United States, supra,* 104 S.Ct. at 3382–3383. The sole issue which remained, therefore, was whether the government possessed the probable cause prior to entering the premises and whether there was an independent source for this information other than the long occupation of the Serna-Ceballos home.

## Evidence Presented

The government produced two witnesses at the hearing to corroborate and supplement the facts outlined in its original memorandum in opposition to Serna's motion to suppress the evidence. Special Agent Gerard Murphy ("Murphy"), the DEA Agent supervising and coordinating the operation, testified about the layout of the Serna-Ceballos home, the surveillance and arrest of the suspects on the evening of June 19, 1985 and the process of compiling information and obtaining the search warrant for Serna's quarters on June 20, 1985.

According to Murphy, who proceeded paragraph by paragraph through the affidavit submitted in support of the issuance of the search warrant, all information in the affidavit was compiled from 1981 through June, 1983 as part of a larger investigation of an international drug conspiracy in which Serna was allegedly implicated. This evidence was not challenged by defense counsel nor rebutted by testimony of a defense witness. Only one paragraph contained information obtained after arrest—paragraph nine which stated that Serna denied his identity upon arrest.

Murphy also testified to the scope of the dragnet which occurred on the evening of June 19, 1985. Approximately eleven suspects were arrested or detained that night, in addition to Mrs. Ceballo's and her child who were detained in their home as part of the government's security check of the premises. Agent Murphy, occupied with the arrest of a suspect who was later released, arrived at the Horace Harding Boulevard home after the forced entry and found approximately five DEA agents conducting an alleged security sweep of the home. Murphy remained at the home for approximately one and one-half hours until approximately 12:00 p.m., when he returned to his Manhattan office and contacted the Assistant United States Attorney (the "AUSA") handling the case to ask him to meet at DEA headquarters to prepare the complaint and affidavits required to obtain a search warrant.

Murphy accounted for the long delay (between 1:30 a.m. when he and the AUSA began preparing the documents and 6:30 p.m. when the warrant was issued) with a description of the confusion surrounding the sudden arrests of the drug suspects. According to Murphy, neither he nor the AUSA had prepared for the arrest of eleven suspects and search of the Serna-Ceballos home. The AUSA had not evaluated the evidence or set the affidavit information down in a complaint. As the documents were being prepared, suspects were being processed and arraigned in both the Southern and Eastern Districts of New York, causing a shortage of available DEA agents. Although the warrant application was originally signed by Murphy, it had to be retyped to permit Special Agent Thomas J. Deignan to be the affiant, and it was Agent Diegnan who appeared in the Eastern District in support of the warrant as soon as he had finished "guarding prisoners" at 4:30 p.m., June 20, 1985. The warrant immediately was taken to the Serna-Ceballos home where the DEA agents commenced a search of Serna's quarters in the top floor of the downstairs apartment.

DEA agent Yvette Torres ("Torres"), present in the Serna-Ceballos home from the time of the initial forced entry through the final search, testified as to agents' conduct during the twenty-one hour occupation of the house. Torres claimed that she and another agent displayed badges through the door peep-hole and pressed their badges against the opaque glass at the entrance before kicking open the door, and Torres stopped Ms. Ceballos who was on her way downstairs to her infant child's room. Torres testified that she and four other agents present checked the entire house for additional occupants, but did not search the common rooms until after the Ceballos consented. Although Torres did go upstairs to the Serna apartment to use the bathroom, she testified that she did not enter other rooms or turn on lights other than those in the hallway and bathroom.

Torres also claims that contrary to Ms. Ceballos' charges, the agents did not attempt to coerce Ms. Ceballos into a consent

but respected her desire to wait until her husband was brought back to the home to consent. In addition, Torres stated that she did restrict Ms. Ceballos' freedom in the apartment by following her movements and maintaining control of her actions.

## The Suppression Motion

At the close of the evidentiary hearing the defense moved to suppress the evidence obtained from Serna's quarters on two grounds: first, because the security check was lacking the indicia of exigency required under *Segura,* and second because the long delay in obtaining the search warrant was an unexplained and unreasonable violation of Serna's Fourth Amendment rights. While the first claim misconstrues the nature of the court's holding in *Segura,* the second unearths one troubling aspect of the Court's *Segura* opinion.

While a lack of exigency might render an attempted "security check" a warrantless search in violation of the Fourth Amendment, the Supreme Court divorced this question of illegal entry from an analysis of whether the government possessed an independent source for the information contained in the search warrant for the same premises. Rejecting an argument identical to the one put forth by Serna, the Court stated:

> Petitioners also argue that even if the evidence was not subject to suppression as primary evidence "seized" by virtue of the initial illegal entry and occupation of the premises, it should have been excluded as the "fruit" derived from that illegal entry. Whether the initial entry was illegal or not is irrelevant to the admissibility of the challenged evidence because there was an independent source for the warrant under which that evidence was seized. Exclusion of evidence as derivative or "fruit of the poisonous tree" is not warranted here because of that independent source.

*Segura v. United States, supra,* 104 S.Ct. at 3391. Furthermore, the Second Circuit Court's *Segura* opinion affirmed the district court's holding that there were no exigent circumstances to justify the warrantless entry into the petitioner's apartment, *United States v. Segura,* 663 F.2d 411 (2d Cir.1981), but the Supreme Court considered this holding irrelevant to the question of whether there was an independent source for the search warrant affidavit information. *Segura v. United States, supra,* 104 S.Ct. at 3385.

■ After *Segura,* an illegal entry without out exigent circumstances does not result in suppression of evidence later secured pursuant to a valid search warrant issued on independent probable cause not directly resulting from the entry. The Supreme Court suggested that recourse for such illegal entry lies in a tort claim: "[I]f officers enter without exigent circumstances to justify the entry, they expose themselves to potential civil liability under 42 U.S.C. § 1983. *Bivens v. Six Unknown Federal Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)." *Segura v. United States, supra,* 104 S.Ct. at 3390.

Serna also contends that the approximately twenty-one hours between the forced entry into the house and the obtaining of the search warrant constitutes an unreasonable delay in violation of the Fourth Amendment and requires suppression of the evidence seized pursuant to the search warrant. While the *Segura* court noted that "Of course, a seizure reasonable at its inception because based upon probable cause may become unreasonable as a result of its duration or for other reasons. *Cf United States v. Place, supra,* [462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) ]," the court did indicate that a finding that the security check was unreasonable would result in a suppression remedy. Indeed, such a result would be inconsistent with the court's separation of pre-warrant illegalities from "independent source" searches pursuant to a search warrant validly executed subsequent to the seizure. The length of the officer's occupation of the premises bears no theoretical relationship to the determination of whether information contained in the affidavit in support of the search warrant was secured before the entry into the home:

None of the information on which the warrant was secured was derived from or related in any way to the initial entry into petitioners' apartment; the information came from sources wholly unconnected with the entry and was known to the agents well before the initial entry. No information obtained during the initial entry or occupation of the apartment was needed or used by the agents to secure the warrant. It is therefore beyond dispute that the information possessed by the agents before they entered the apartment constituted an independent source for the discovery and seizure of the evidence now challenged.... The valid warrant was a "means sufficiently distinguishable" to purge the evidence of any "taint" arising from the entry.... By the same token, our cases make clear that evidence will not be excluded as "fruit" unless the illegality is at least the "but for" cause of the discovery of the evidence.

*Id.* at 3391 (citations omitted).

The four dissenters also understood the majority's reasoning to sever any connection between an unreasonable delay and a suppression remedy:

Under the majority's approach, the agents could have remained indefinitely—impounding the apartment for a week or a month—without being deprived of the advantage derived from the unlawful impoundment.

*Id.* at 3403. However unfortunate this conclusion, it is rooted in the stance of the majority opinion which rejects the dissenters notion that "but for" the impoundment, the government would not have had access to the evidence. *Segura v. United States, supra,* 104 S.Ct. at 3391–3392.

▇ Furthermore, the majority explicitly confronted a 19-hour delay in securing a warrant similar to the one at bar, and found that it was not unreasonable for the government to experience delays in securing a warrant in a large metropolitan area, nor was it unreasonable to first process arrestees before turning to the task of securing the warrant. This court concludes, therefore, that under the Supreme Court's *Segura* opinion, the delay in securing the search warrant was not unreasonable, and even if unreasonable, cannot be the basis for suppression of the evidence gathered pursuant to the search warrant. It would be mechanistic to grant suppression on the basis of a 22-hour delay, 19-hours having been held to be reasonable.

**Rule 48(b) Motion**

On September 4, 1985 this court granted an application made by the government for an exclusion of time computed for purposes of the Speedy Trial Act. This exclusion was sought under 18 U.S.C. § 3161(h)(9) which provides in relevant part:

(h) The following periods of delay shall be excluded in computing the time within which an information or indictment must be filed, or in computing the time within which the trial of any such offense must commence:

(9) Any period of delay, not to exceed one year, ordered by a district court upon an application of a party and a finding by a preponderance of the evidence that an official request, as defined in section 3292 of this title, has been made for evidence of any such offense and that it reasonably appears or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country.

The government sought this exclusion in order to obtain wiretap evidence of conversations of one of Serna's alleged "known associates" gathered by the Spanish police. The conversations allegedly implicate Serna in an international narcotics organization.

▇ Serna has moved pursuant to Rule 48(b), Fed.R.Crim.P., for the dismissal of the indictment, on the grounds that the government has not made a good-faith attempt to secure this evidence from Spain expeditiously, and that the exclusion is being used as a "tool for delay" to give the government time to gather evidence against Serna. However, the affidavit of Steven M. Kaplan, Assistant United States Attorney (the "AUSA"), submitted in oppo-

sition to this motion demonstrates that the government has made a diligent and good faith effort to obtain the Spanish evidence and is entitled to a continued exclusion under 18 U.S.C. § 3161(h)(9).

The AUSA's affidavit reflects a continuing effort to obtain the relevant wiretap evidence which has been thwarted by bureaucratic "red tape." On July 19, 1985 the AUSA made a "Request for Judicial Assistance" (the "Request") to Spain, in the form of a request from the United States Judiciary to the Judiciary of Spain. The request was forwarded to the Office of International Affairs, translated, and sent to the Department of State, which forwarded it to the United States Embassy in Spain for submission to the Spanish authorities on August 22, 1985.

According to a telex from a Drug Enforcement Administration attache in Spain, annexed to the Kaplan affidavit, the Request was submitted to the Spanish Ministry of Justice on August 30, 1985 and was then transmitted to the Foreign Affairs Office. Since August the government has made repeated inquiries through the United States Embassy in Spain as to the status of the Request, the most recent occurring on January 23, 1986. In addition, the government has been informed by Roger Yochelson, an attorney with the Department of Justice Office of International Affairs, that the Spanish Authorities had given informal advice that the Request had been granted and the wiretap evidence would be promptly sent to the United States. Indeed, some as yet unexamined material was received from the Spanish authorities as this opinion was being prepared.

In summary, the government has pursued this Spanish evidence through every available channel and appears to have received assurances that it is on the verge of obtaining recorded conversations. Under these circumstances the government is entitled to its continued Speedy Trial Act exclusion for a time period not to exceed the one-year statutory limitation.

For the aforementioned reasons, Serna's motion to suppress the evidence is denied, and the evidence gathered from Serna's quarters under the authority of the search warrant may be introduced at trial. Serna's motion to dismiss the indictment is also denied.

IT IS SO ORDERED.